Kashiwa, Judge,
delivered the opinion of the court :*
The issue in this tax refund suit is whether plaintiff qualifies for exemption from the federal income tax under Sec *8 tion 501(c) (13) of the Internal Revenue Code of 1954.[1] For the reasons hereinafter to be discussed, we hold for the defendant and against the plaintiff.
Plaintiff was incorporated under the laws of the State of California in October, 1950, to operate as a non-profit cemetery corporation near Los Angeles, California. Detailed facts with relation to its organization, operation, control, and other relevant matters will be hereafter discussed as they relate to the issues raised by § 501(c)(13).
In early 1952, plaintiff applied for and received a ruling that it was exempt from income tax under § 101(5) of the Internal Revenue Code of 1939, which is the predecessor of § 501(c) (13) of the Internal Revenue Code of 1954, above quoted. Twelve years later, in August 1964, plaintiff received notice of the contemplated revocation of such exemption ruling. It protested this action but eventually filed on February 3, 1966, an income tax return for its- fiscal year ended September 30, 1965, paying a tax of $237,264. The Internal Revenue Service did in fact revoke the exemption on March 10,1966, retroactively effective to all years beginning after September 30, 1961. On September 23, 1966, plaintiff paid an assessed deficiency for 1965 of $6,031.
In its 1965 return, plaintiff deducted $568,247 as the cost of its sales of cemetery property. Included in that cost was $421,786 which plaintiff accrued as its obligation under a 1952 stock purchase agreement, the effect of which is at issue in this case. Briefly, the agreement provided for plaintiff’s purchase of the stock of Bartolo Corporation, a for-profit California cemetery, in exchange for a percentage of gross sales. *9 The IRS disallowed the $421,78'6 deduction and assessed a further deficiency of $201,959. On June 9,1967, plaintiff filed an amended return in accordance with the Service’s determination but deferred a portion of its tax by electing to report its income under the installment basis. Thus, the return showed an aggregate tax liability for 1965 of $245,219. Since plaintiff had already made payments of $237,264 and $6,031, it paid only $1,924 with the return. Following the Government’s challenge to using the installment sales method, plaintiff paid an additional sum on September 1, 1967, but the Government has now refunded this amount with interest, conceding that taxpayer was entitled to elect the installment basis. Thus, there remains at issue the $245,219, which is covered by appropriate claims for refund. The filing of this suit was timely.
Plaintiff’s claim to the exemption from tax under § 501 (c) (13) is based on the portion of that paragraph following the semicolon:[2]
* * * any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual.
We shall first take up the question of benefit to private individuals. Whether any of plaintiff’s net earnings inured to such private benefit depends on the effect given a stock purchase agreement plaintiff made on December 26, 1952, with the shareholders of the Bartolo Company and by which plaintiff acquired the greatest portion of its land.[3] Bartolo was the last of a series of corporations, with generally common ownership, that had been operating a for-profit cemetery business for many years. In 1951, it acquired some 1,800 acres of raw land for future expansion at a cost of $281,000. *10 Additional purchases were made ill 1951 and 1952 of a total of 257 acres for $390,000. When plaintiff was formed, all of its seven trustees were shareholders of Bartolo and members of a Los Angeles law firm which represented the shareholders. Though some outside trustees evidently were subsequently appointed, at all pertinent times the Bartolo shareholders and members of said law firm constituted a majority of plaintiff’s trustees.
Under the agreement, all of Bartolo’s outstanding stock was sold to plaintiff. In consideration therefor, plaintiff agreed to pay on the following basis: 30 percent of the gross selling price of gravesites sold from any property acquired from Bartolo; 10 percent of sales of mausoleums, niches, and crypts; 20 and 25 percent of sales of various underground crypts; 50 percent of rents and royalties received for the use of any of plaintiff’s real property; and, on sales of real property under any other circumstances, during the first five years, 90 percent of the proceeds, during the following 10 years, 80 percent, and, thereafter, 75 percent. There was no provision for a minimum annual payment and no stated interest rate. The agreement was to continue until all of the property was sold and fully paid for. It further provided that, upon consent of 51 per cent in interest of the sellers, they could subordinate their claims to debts which plaintiff might incur to others and postpone or defer, in whole or in part, payment of amounts due them by plaintiff. The default clause recognized that the price to be paid was “in an amount not presently determinable and over a period, the duration of which cannot presently be determined.” Consequently, in lieu of actual damages in the event of plaintiff’s default, 51 percent of the sellers could immediately demand payment of any amounts then due and recover the Bartolo stock or the unsold land.
From 1952 through 1966, Bartolo and plaintiff embarked on a major development of the cemetery. Existing buildings were improved and new ones were built, including two chapels. Some 633 acres of the new land were cleared and graded to provide more gravesites. The cost of these projects was some $7,669,000 with the land development accounting for over one-half. To finance these projects, Bartolo and *11 plaintiff borrowed a total of $1,500,000 from two banks in 1954 and again in 1956. The former Bartolo shareholders (plaintiff’s trustees) agreed to subordinate their rights under the 1952 agreement to these loans and any subsequently incurred debt to the banks to the extent of $2,500,000, with the understanding that the bank notes would not be due until December 1, 1969. In addition, they agreed that during the existence of the bank debt, plaintiff would limit its payments to the former Bartolo shareholders (hereinafter sometimes called transferors) under the 1952 agreement to only $120,000 per year and defer the remainder without interest.
By 1957, plaintiff began to feel a cash pinch. Its ambitious development program, together with the obligation to the transferors and its current operating expenses, outpaced its line of credit from the banks. Finally, in 1961, the transferors agreed to an amendment of the 1952 agreement which reduced the percentages of gross sales payable to them by approximately one-third. This was to be retroactive to 1958 and to continue until 1978. Thereafter, the original terms were substantially reinstated. The consideration for this amendment was the extension of the percentage-of-sales obligation to all lands acquired by plaintiff at any time after the 1952 agreement (about 210 acres by 1961). For the period from 1958 through 1967, the effect of the reduced percentages was to lower the accrued amount payable to the transferors by $2,577,000.
After 1961, plaintiff’s cash position improved for a number of reasons. These included sales of pre-need funeral service debentures which totaled $6,700,000 by September 30, 1967; the leveling out of pre-need sales, which reduced the necessity for additional funds; and deferral of payments to the transferors on reduced percentages. By 1968, plaintiff had over $7,000,000 in cash, and a net worth of $10,000,000.
From the inception of the 1952 agreement until September 30, 1968, the transferors received from plaintiff $5,500,-000. As of that date, an additional $1,884,784 was due them but had been deferred because of the subordination agreements. Moreover, if the reduced percentages provided under the amendment to the agreement had not been in effect from 1958 to 1967, an additional $2,577,000 would have been owing.
*12 Since the purchase involved some 2,154 acres and each acre could accommodate about 1,136 gravesites, there was involved about 2,445,000 salable gravesites. At the 1952 selling rate, 12,'500 spaces per year, it was anticipated that the agreement would continue for about 200 years. And if the $160 price per lot remained constant, the sellers expected to receive about $615,000 per year or a total of $123,000,000. The Trial Commissioner found that the agreement constituted a sale with the purchase price of $6,951,583 and that the payments, even though extending over an extremely long period, represented installments on the purchase price plus seven percent interest. Defendant, however, characterizes the transaction as an exchange of stock for an equity interest in plaintiff. Accordingly, defendant contends that to the extent that plaintiff has earnings in excess of capital, the payments to the transferors constitute corporate distributions of net earnings in violation of § 501(c) (13).
This issue is not uncommon to cemetery companies because frequently they are unable to get adequate financing for land acquisition. They have little credit of their own and the land is undesirable collateral because of its limited use. Consequently, land is sometimes acquired by conveying to the seller a percentage interest in the cemetery’s subsequent sales of the land. In its brief, the Government emphasizes that five Circuits and the Tax Court have now held that various forms of such indebtedness, payable by a share in the sales proceeds, issued to acquire land are really equity investments. Gardens of Faith, Inc. v. Commissioner, 345 F. 2d 180 (4th Cir. 1965), aff’g per curiam 23 T.C.M. 1045 (1964), cert. denied, 382 U.S. 927 (1965) ; Sherwood Memorial Gardens, Inc. v. Commissioner, 350 F. 2d 225 (7th Cir. 1965); Peterson v. Commissioner, 380 F. 2d 1 (9th Cir. 1967); Jefferson Memorial Gardens, Inc. v. Commissioner, PH Memo T.C. ¶66,050 (1966), aff'd 390 F. 2d 161 (5th Cir. 1968) (issue conceded on appeal); Hamilton Memorial Gardens v. Commissioner, 394 F. 2d 905 (6th Cir. 1968) (issue conceded on appeal), cert. denied, 393 U.S. 936 (1968); Knollwood Memorial Gardens v. Commissioner, 46 T.C. 764 (1966).
Historically, this typo transaction won initial approval by the Board of Tax Appeals which twice allowed non-profit *13 cemeteries to preserve their tax exempt status despite land acquisition agreements providing for payment from a percentage of lots sold. Commissioner v. Kensico Cemetery, 96 F. 2d 594 (2d Cir. 1938), aff'g 35 B.T.A. 498 (1937), non-acquiesced in, 1937-1 Cum. Bull. 40; Forest Lawn Memorial Park Association, Inc., 45 B.T.A. 1091 (1941), nonacquiesced in, 1942-2 Cum. Bull. 25, withdrawn and acquiesced in, 1946-2 Cum. Bull. 2, withdrawn and nonacquiesced in, 1960-2 Cum. Bull. 8. As is evident from the above citations, the Internal Revenue Service had great difficulty in responding to these cases. This is understandable, because at the time when these cases arose, the large commercial cemetery industry was just developing. Subsequently, it became apparent to the Government that investors could improperly take advantage of the tremendous profit potential in the sale of such small lots as gravesites.
Later cases have usually involved for-profit cemeteries, but the basic percentage-of-sales agreement is still the source of the controversy. For example, in Sherwood Memorial Gardens, supra, the plaintiff cemetery was a newly organized for-profit corporation that issued 1,000 “certificates of indebtedness” to two non-shareholders (the wife of the 99 percent shareholder and an unrelated attorney) in exchange for their transfer of land and $30,000 cash to develop the land into a cemetery. The certificate holders were entitled to 25 percent of the gross sale price of the land for 15 years. The cemetery deducted the amount it paid to certificate holders as the cost of the land sold, and this was challenged as being distributions of equity capital.
Despite the fact that the certificate holders were not shareholders, the Tax Court characterized the transfers as contributions to equity capital, citing Brown Shoe Co. v. Commissioner, 339 U.S. 583, 589 (1950). The petitioner contended that this was error because (1) the 25 percent interest existed regardless of net income, (2) the interest terminated after 15 years, (3) the certificate holders could not vote or manage the cemetery, and (4) they shared equally with creditors in the event of insolvency. The Seventh Circuit, however, agreed with the Tax Court. It found two of the classic elements of debt lacking: interest and fixed principal amount. *14 Moreover, it approved of the Tax Court’s reliance on the following factors to support the decision: (1) thin capitalization of the cemetery (60-1), (2) the speculative nature of the enterprise, (3) the suspicion that the land-share method, usually employed by non-profit cemeteries, was prompted by a tax avoidance motive, and (4) the obvious tax avoidance gained by increasing the cemetery’s basis in the lots and allowing capital gains treatment to the certificate holders.
This same arrangement was considered, from the certificate holders’ point of view, in Peterson v. Commissioner, 380 F. 2d 1 (9th Cir. 1967). Here, the facts presented an even more flagrant situation. The newly formed corporation issued debt certificates to its controlling shareholders who were entitled to 20 percent of gross sales of all land sold as cemetery lots. The corporation had been initially capitalized at $60, and the land (10 acres) was transferred with a cost basis to the holders of $2,500. The court affirmed the Tax Court’s conclusion that an equity, not debt, interest was created because the certificates did not (1) guarantee payment, (2) provide for interest, (3) fix a principal amount, or (4) fix a set maturity date.
Of these recent cases, only Knollwood Memorial Gardens involved a tax-exempt corporation, and as plaintiff points out, it was the first case to deny the § 501(c) (13) exemption on the basis of a finding that the percentage-of-sales agreement constituted an equity interest in the corporation. By virtue of this, plaintiff seeks to distinguish itself from the cases which involved taxable cemeteries. However, we do not believe that this difference has any effect on the question of whether or not there was an equity interest. The statutory test prohibits the exemption whenever profits inure to the benefit of any “private shareholder or individuaT,, (emphasis added). Indeed, in Knollwood, the Tax Court has already reached this conclusion:
* * * we do not see any meaningful or convincing difference between equity interests owned by non-stockholders in a thinly capitalized stock corporation [as in Sherwood Memorial Gardens] and similar interests owned by individuals who contribute to non-stock corporations [as in Knollwood] in return for such interests.
*15 The statute thus specifically recognizes that corporate profits may wind up in the hands of non-stockholders, ■and whenever this happens, unless the corporation qualifies otherwise under the section, exemption is denied. We think the exemption should be denied in the case of non-stock membership corporations as well as in the case of stock corporations wherever the facts disclose that individuals share in the corporate profits because of equity interests. The net earnings of Knollwood’s operation cannot be properly computed by first deducting payments to the landshare holders because those payments were not payments for the purchase price of land. Thus the distributions by whatever name called are of net earnings. [46 T.C.at 786].
We feel that the principles applied in the for-profit cemetery cases apply equally well to our consideration, in this case, of the equity interest question.
In Knollwood, the Tax Court considered a transfer similar to that involved in this case. The cemetery corporation acquired the land plus the seller’s obligation to develop part of it into a cemetery. In exchange, it agreed to pay 20 percent of the sale proceeds of gravesites, the agreement to continue for 20 years after the last lot was sold. Just as in the instant case, the “seller” was one of the organizers of the cemetery company. In holding that the purported debt was really an equity interest, the court used many of the tests for indebtedness which had been previously applied to for-profit cemetery cases:
Despite the fact that the land purchase agreement which created the interests of the landshare holders is couched in terms of purchase and sale, and in form appears to make the transferor of the land a creditor, virtually none of the elements of a true debt are present. There was no unconditional promise to pay; payment was contingent upon future sales by the alleged “debtor.” There was no fixed date of maturity; petitioner’s obligation continued for an undeterminable period of time. There was no fixed amount of principal obligation; the amount ultimately to be received by the alleged “creditors” depended upon the number of lots sold. Even if the total number of lots to be carved out of the 20 acres were accurately determinable in advance and it be assumed that all of these lots would be sold, the ultimate amount to be received by the landshare holders would not be de *16 terminable since the amount is also dependent upon the price at which lots are sold, a factor which might vary over the future years. Furthermore, since there was no fixed principal amount owed, there was no interest payable. We recognize that a sale may be made and the consideration therefor may be based on a percentage of the resale price, but here on the evidence of record we can only conclude that no such transaction took place. [46 T.C. at 780-781, footnote omitted].
We believe that the Tax Court’s objections can be made just as forcefully in this case. The substance of this transaction resembles an equity interest because all the traditional elements of a valid debt are missing. See Sayles Finishing Plants, Inc. v. United States, 185 Ct. Cl. 196, 203, 399 F. 2d 214, 218 (1968), quoting from Gilbert v. Commissioner, 248 F. 2d 399, 402 (2d Cir. 1957). (1) There was no unqualified obligation on plaintiff to pay because the installments depended on the sale of gravesites. (2) There was no maturity date because the obligation was to continue until all lots were sold. As stated above, by virtue of a 1961 amendment to the agreement, the obligation to pay a percentage of the sale price was extended to all contiguous property acquired by plaintiff at any time after the 1952 agreement. (3) There was no sum certain because the market price of gravesites could change. Indeed, the evidence showed that by 1968 lots were selling at $243 each, a 52 percent increase over their 1952 price and a 125 percent ‘increase over their 1947 price (see finding 57). (4) There was no stated interest rate. (5) There was no minimum annual payment. (6) There was no right to share with general creditors in the assets because subsequent to the agreement the former Bartolo shareholders exercised their discretion to subordinate their claim to other debts. (7) In addition, there was no paid-in capitalization to the business. It was formed specifically to be the recipient of land, most of which had been acquired by Bartolo only a year or so before. (8) And lastly, the transferors had complete control over plaintiff’s operations because they constituted its trustees. Therefore, they could determine how much was paid on the purported “debt.” This control is generally inconsistent with a true debtor-creditor relationship. P. M. Finance Corp. v. Commis *17 sioner, 302 F. 2d 786, 789 (3d Cir. 1962); Knollwood Memorial Gardens, supra, at 782. By themselves, each of these factors might be acceptable in a valid debt instrument, but taken together, they are overwhelmingly persuasive that this transaction created an equity interest in plaintiff. See Sayles Finishing Plants, Inc. v. United States, supra; American Processing & Sales Co. v. United States, 178 Ct. Cl. 353, 371 F. 2d 842 (1967); Indian Lake Estates, Inc. v. Stewart, 448 F. 2d 574, 578-579 (5th Cir. 1971).
Plaintiff, relying on Commissioner v. Brown, 380 U.S. 563 (1965), argues that if a valid sale has occurred, the above-mentioned criteria for determining the degree of risk-shifting become inapplicable. In that case, the sale price was payable out of income generated by the business being sold, so there was no shifting of risk to the buyer, a charity. Despite this, the Supreme Court upheld the sale because of the good faith, arm’s-length bargaining between the buyer and seller which resulted in a reasonable and fixed price payable over a ten-year period. The sellers had definitely parted with property for a fixed price. In our case, however, we find these elements missing. There was no definite price at the time of the 1952 .agreement, and there was no limiting period within which the amounts had to be paid. Indeed, the transferors’ interest in plaintiff was to last as long as plaintiff was in the business of selling gravesites. Thus, there is no basis upon which to conclude that a valid sale occurred. This is quite different from Brown in which, “If the stipulated price was paid, the Brown family would forever lose all rights to the income and properties of the company.” 380 U.S. at 569. We think that Brown presented a different factual context. Though we agree that shifting of risk is not a sine qua non to a sale, we believe that it becomes relevant in a situation like that before us. The transferors entered into a bona fide agreement, but the terms of the agreement left them with an equity interest in plaintiff. Similarly, our decision in Union Bank v. United States, 152 Ct. Cl. 426, 285 F. 2d 126 (1961), is distinguishable because it involved a definite purchase price which was due at the end of a ten-year period.
The disparity 'between the amounts involved herein further compels the result we reach. In Knollwood, supra, the land- *18 share holders’ total investment for land and improvements was $13,520, and the potential return was more than $200,-000 — 14 times their investment. On this fact, the Tax Court made the following conclusion:
When, as here, the alleged “purchase price” bears no reasonable relationship to the fair market value of the assets conveyed, it is stretching normal definition beyond its breaking point to regard the transaction as a sale. The transaction was a contribution to capital placed at the risk of the business, and as such no debt was created; payments to landshare holders, “investors” in the cemetery enterprise, were distributions with respect to their respective proprietary interests. [46 T.C. at 783].
Similarly, here the property was worth some $10,000,000 at the time of the transfer, and the transferors expected to receive more than $123,000,000 — 12 times their investment. To support its contention that a sale occurred, plaintiff emphasizes the trial commissioner’s finding that the present value, in 1952, of the anticipated payments was only $6,951,583, which is less than the property’s fair market value at the time. Therefore, it says, the gross disparity between purchase price and fair market value present in KnoWwood does not exist. But we do not attach the same significance to present value as does plaintiff. Of far more importance is the total payout which the former Bartolo shareholders would receive. This latter amount, which was the focus of the Tax Court’s attention in Knollwood, could considerably exceed $123,000,-000 because of the previously mentioned 52 percent rise in the market price of the lots, and we believe that this is indicative of an equity interest. The increase in market value of the gravesites in itself shows the weakness of plaintiff’s sale argument. If the payout is characterized as part payment of principal and part interest for the credit extended, the sum of which is $123,000,000, then an increase in the sale price would lead to an earlier satisfaction of the debt. But this is not the case here. When the market price rose to $243 per lot, the total potential payments under the agreement rose to nearly $187,000,000. Thus, the payments would continue long after the “purchase price” would have been satisfied. This situation can only be described as participation in net earnings.
*19 We do not mean, by our decision today, to hold that the percentage-of-sales agreement is, per se, a violation of § 501 (c)(13). See Rose Hills Memorial Park, Inc. v. Commissioner, 23 T.C.M. 1434 (1964) (an unrelated Connecticut corporation) and Washington Park Cemetery Assn., Inc. v. Commissioner, 22 T.C.M. 1345 (1963). We do believe, however, that the Rensieo and Forest Lawn oases, supra, have been considerably weakened by subsequent cases. We only hold that, on the basis of the situation before us, a contribution to capital was made instead of a sale and consequently net earnings of the corporation wound up in individuals’ hands in violation of § 501(c) (13).
Another issue raised relates to the basis to plaintiff of the land it acquired on the liquidation of Bartolo. Plaintiff contends, consistent with its sale theory, that it is entitled to a •basis in the assets equal to its cost of the Bartolo stock acquired in the 1952 agreement. It does not contend that this result is governed by § 334(b) (2)[4] because the Bartolo liquidation did not occur within the two-year period of § 334(b) (2) (A) (ii). Rather plaintiff seeks to have us apply the doctrine of Kimbell-Diamond Milling Co. v. Commissioner, 10 T.C. 7 (1948), aff'd 187 F. 2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827 (1951), to achieve the same result. Plaintiff reminds us that we have previously held that the KimbeTl-Diamond doctrine has not been pre-empted by enactment of *20 § 334(b) (2). American Potash & Chemical Corp. v. United States, 185 Ct. Cl. 161, 179-186, 399 F. 2d 194, 206-209 (1968), rehearing granted and case remanded, 185 Ct. Cl. 186, 402 F. 2d 1000 (1968).
The purpose of § 334(b) (2) and the Kimbell-Diamond doctrine is to treat a taxpayer as if it had bought assets directly when direct ownership is the objective and when it can only be achieved by purchasing the owner-corporation’s stock and then liquidating the corporation. American Potash, supra at 180-181. On the facts before us, we have found that the transfer was of an equity interest and did not constitute a sale. Furthermore, we are not certain that plaintiff’s objective was to own the land directly. The fact of Bartolo’s existence did not impair the operations of plaintiff or its payments to the transferors. And it would presumably have continued to operate Bartolo as a subsidiary but for the repeal of the California law imposing a tax on the liquidation. This being the case, we are not presented with a situation in which we must consider whether to apply the Kimbell-Diamond rationale.
As plaintiff’s trustees, the former Bartolo shareholders made a contribution to the capital of plaintiff when they transferred their stock in exchange for the equity interest. Therefore, plaintiff’s basis in the stock was a carryover from the former shareholders under § 113 (a) (8) of the 1939 Code.[5] See Knollwood, supra at 791, n. 15. Thereafter, when Bartolo was liquidated, plaintiff succeeded to Bartolo’s basis in the land under § 334(b) (1).
Accordingly, the petition will be dismissed.
FINDINGS op Fact
1. Plaintiff was incorporated on October 25, 1950,. under Part 1, Division 2, Title 1, Section 9200 et seq. of the California Corporation Code. The parties have stipulated for *21 purposes of this proceeding (1) that as such an entity, plaintiff was prohibited by California law from issuing stock and (2) that in fact it issued none.
2. On November 1,1950, plaintiff took over the operation of what has since become, by virtue of subsequent real estate acquisition, the nation’s largest single-tract memorial park. Utilizing the accrual method of accounting and operating on a September 30 fiscal-year basis, plaintiff operates a mortuary and engages in various other activities incidental and subordinate to that of selling interment rights for the burial of human remains. Now comprising more than 2,200 acres, plaintiff’s cemetery property is located just northwest of the city of Whittier, California, about 12 miles east of the downtown center of Los Angeles. The property has sufficient capacity to accommodate almost 2,500,000 gravesites.
History AND DevelopmeNT of PlaiNtife’s Cemetery Property
3. The real properties to which plaintiff succeeded in ownership following its formation had been accumulated over a period of years by a series of for-profit corporations dating back to 1914 when Cemeteries Improvement Corporation (Cemeteries) was formed for the purpose of establishing a cemetery near Whittier on 18% acres of land that it acquired from A. H. Gregg. The cemetery’s first interment occurred in 1915 and a mausoleum was built on the property in 1916. Its operations continued and expanded thereafter.
4. At a Cemeteries directors’ meeting on August 13, 1928, J. L. Seppi, A. H. Gregg, and his son, John D. Gregg, resolved to take the preliminary steps necessary to the formation of a new corporation to acquire Cemeteries’ assets, assume its liabilities, and to acquire certain other properties needed to secure financing for a new mausoleum.
5. In 1929, Cemeteries effected a reorganization. Whittier Heights Memorial Park (Whittier) acquired the net assets of Cemeteries, which by that time had increased to include approximately 31% acres of land, in exchange for 704 shares of stock in Whittier. A. H. Gregg received approximately 54 percent of Whittier’s stock, the same percentage of ownership *22 that he held in Cemeteries. Pursuant to the plan of reorganization, A. II. Gregg then sold four-fifths of his stock-holdings in the two companies in equal shares to John Gregg, W. A. Johnson, J. L. Seppi, and A. Wardman for a total of $100,006.50.
In addition to the actions described above, at a directors’ meeting on August 29, 1929, Whittier authorized the purchase of approximately 80 acres of land owned by A. II. Gregg. Based upon appraisals that included an estimate of the rapidly rising land costs, the directors authorized the issuance of 3,447 shares of treasury stock with a stated value of $115.50 per share to A. H. Gregg, equivalent in face value to a price of $5,000 per acre.
6. Following the reorganization detailed above, Cemeteries continued to exist as a holding company, its only asset being the 704 shares of Whittier stock. In 1930, A. H. Gregg resigned as president and director, A. Wardman was elected president, and W. A. Johnson was appointed as a director to succeed H. Sewell.
7. The Whittier corporation, under various names, operated the cemetery from 1929 until 1950. By 1930, the second mausoleum had been built. On August 12, 1930, the name of the company was changed to Rose Hills Memorial Park (Rose Hills), and on November 26, 1950, it was further changed to Bartolo Company.
8. From 1930-1937, J. D. Gregg, A. Wardman, W. A. Johnson, and J. L. Seppi were the controlling shareholders of Rose Hills. From 1937-1950, L. E. Bancroft and G. Sloan, in addition to the aforementioned individuals, were the controlling shareholders of Rose Hills and Bartolo.
9. From 1930 through 1950, Rose Hills, under the general management of John D. Gregg, engaged in the sale of grave spaces, made interments, sold all incidental facilities that were available and incident to business at that location. During this period, Rose Hills and Bartolo acquired an additional 74 acres of land and its stockholders controlled an additional 1,800 acres that could be used for cemetery purposes.
10. On December 16,1942, A. Wardman, J. L. Seppi, John D. Gregg, and W. A. Johnson, the directors of Cemeteries, *23 resolved to sell Cemeteries’ 704 shares in the corporation then known as Eose Hills (originally Whittier) for $50 a share. On December 22, 1942, the directors formally resolved to wind up and dissolve. Cemeteries was thereupon dissolved.
11. On September 1, 1943, the following individuals agreed to form a limited partnership, to be called the Banslope Company, with percentage interests as hereafter indicated: W. A. Johnson (trustee), 46 percent; M. Corkett (trustee), 12 percent; F. Fuller (trustee), 12 percent; L. Bancroft, 11 percent; and G. Orton, J. Seppi, A. Wardman, G. Sloan, the balance. Banslope was formed for the stated purpose of manufacture, installation, purchase and sale of merchandise, including cemetery accessories, and, although it had other investments, its active business involved selling memorial tablets and markers.
On May 13, 1946, Banslope Company was incorporated and succeeded to the assets, subject to the liabilities, of the limited partnership. In exchange for their respective partnership interests, the partners received proportionately equivalent value in the form of Banslope Company stock;[1] the total fair value of the partnership having been determined at not less than $110,000.
The officers of Banslope, who were also the directors, were as follows: W. A. Johnson, president; E. L. McNitt, Jr.,[2] vice president; and W. R. Fuller, treasurer.
12. It was Gregg’s objective to have Banslope acquire land owned by Central Oil Company, consisting primarily of 1,750 acres of hill land in Whittier, California, so that the cemetery could later obtain that land for its ultimate expansion and development. Gregg constantly participated in discussions with the directors and managers of Banslope that resulted in Banslope’s decision to acquire a controlling interest in Central. By January 13, 1947, Banslope owned such an interest in Central.
13. On January 13,1947, at a directors’ meeting of Central Oil, four of the former directors resigned and John D. Gregg, *24 R. L. McNitt, W. A. Johnson, and L. E. Bancroft became the new directors.
On or about April 2, 1947, the name of Central Oil was changed to Central Land and Grazing Company (Central). The capital' structure was revised to provide a stated capital of $240,000 and a $40,000 loan to Banslope was approved.
14. For each of the fiscal years ended September 30, 1947 through September 30,1950, Rose Hills’ after tax profits were $88,595; $143,252; $178,034; and $180,869, respectively. Rose Hills was able to obtain loans from two banks, Security First National Bank of Los Angeles (Security) and Citizens National Trust & Savings Bank of Riverside (Citizens) as well as from other sources, principally Rose Hills’ affiliates. During 1946 and 1947, Citizens made short-term unsecured loans totaling $200,000, which Rose Hills repaid by 1948. As of September 30, 1950, Rose Hills had secured and unsecured notes payable in excess of $300,000.
The Period October 25, 1950-November 30, 1952
15. On October 25, 1950, Rose Hills Memorial Park Association, plaintiff, was incorporated under California law as a non-profit cemetery corporation. Pursuant to the bylaws, the exercise of all corporate powers, which included the right to select and remove all officers, agents and employees was vested in a board of trustees. At date of incorporation all members of the board of trustees were associated with the Los Angeles law firm of Latham & Watkins. The California Corporation Code requires that non-profit, non-stock cemetery corporations have members as well as trustees or directors. At all times, the same individuals have been plaintiff’s members and its trustees. No separate membership register was required by State law and none was kept. The names of the members were always readily ascertainable, however, by reference to plaintiff’s books and records.
16. By a letter agreement of November 1, 1950, between plaintiff and Bartolo, plaintiff agreed to take over operation of the cemetery and conduct that business in a manner similar to that which Bartolo had employed. In addition, plaintiff agreed to purchase land needed for cemetery purposes *25 from Bartolo and to pay for it at the rate of 50 percent of the proceeds from the sale of lots, plots, and graves, and 60 percent of the gross proceeds from the sale of niches, crypts, vaults, family sections, and other mausoleum columbarium property, based upon schedules of reasonable minimum prices to be agreed upon in advance and exclusive of amount col- ^ lected for endowment or special care.
17. On February 9, 1951, the directors of Banslope approved the proposed merger of Banslope with Bartolo. On February 19, 1951, the shareholders of Banslope who had held its 11,000 outstanding shares of stock since December 18, 1946, approved the merger. On the same day, the Bartolo shareholders, namely, John D. Gregg, L. E. Bancroft, J. L. Seppi, G. W. Sloan, A. Wardman, and W. A. Johnson and his daughters, Mrs. F. Fuller and Mrs. M. Corkett, approved the merger.
On February 19,1951, Banslope was merged into Bartolo, which was the surviving corporation. Bartolo had previously effected a 35 for 1 stock split, increasing its outstanding shares from 3,452 to 120,820. Banslope shareholders received in cancellation of their shares approximately 2.7459 shares of Bartolo for each Banslope share. The stock split and subsequent merger caused Bartolo to have outstanding 151,025 shares of its stock.
18. On April 9, 1951, Bartolo purchased Central’s assets (other than mineral rights) subject to its liabilities. Central’s assets included 1,750 acres of hill land in Turnbull Canyon which were purchased for approximately $163,200 and 53.75 acres of pasture land on Workman Mill Road, purchased for approximately $118,270.
Central conveyed the mineral rights to the hill lands to Puente Farms Company (Puente) (incorporated on March 8, 1951), in exchange for 24,000 shares of Puente stock. With the exception of J. Seppi, the same persons who were both trustees of plaintiff and directors of Bartolo were directors of Puente. After the sale of assets to Bartolo, mentioned above, Central distributed all of its remaining assets, i.e,, cash and Puente stock, to its shareholders.
*26 Several oil wells have been drilled on the hill lands but none have produced any oil. The last drilling lease was quit-claimed by the lessee in 1958.
19. On May 14, 1951, Bartolo entered into loan agreements with Citizens and Security Banks whereby these banks were committed to lend until September 1,1952, up to $700,000 at 4 percent per annum, payable monthly.[3] In addition to stated requirements as to Bartolo’s net worth and current ratio, the banks acknowledged that the loans were based upon Bartolo’s present executive management and no changes could be made without their consent.
20. On July 1, 1951, plaintiff and Bartolo entered into an agreement effective November 1,1950, to spell out in further detail their letter agreement of that earlier date. Article 3, Section D of the agreement provided for the purchase by plaintiff of approximately 61 acres of land for $2,055,306 payable in 10 or less annual installments, without specified minimum or maximum amounts and without interest on the unpaid balance, the first installment payable September 30, 1951. The purchase price for the 61 acres, which had been fully developed for cemetery use and was in condition to receive interments, was determined by taking 50 percent of the estimated aggregate sales price of the individual grave sites when finished. Bartolo’s basis for the 61 acres was $223,542. Plaintiff also acquired the option to purchase the bulk of the additional land owned by Bartolo which was dedicated and/or for which a permit had been issued for cemetery purposes as of November 1, 1950. Bartolo was obligated to develop such additional land designated for purchase by plaintiff and would receive 50 percent of plaintiff’s then estimated average selling price of all grave spaces on the land so purchased, also payable in 10 or less annual installments without interest, from and after delivery of the deed by Bartolo.
Part IY of the agreement covered the purchase of the two mausoleums for $603,480 payable in 10 or less annual install *27 ments without interest.[4] The purchase price for the mausoleums was determined by taking 60 percent of the total estimated gross proceeds from this property. Bartolo’s basis for the mausoleums was $256,652.
21. On September 28, 1951, plaintiff entered into loan agreements with the same two banks of the May 14, 1951 agreement. Under the agreements, generally embodying the same conditions as the earlier ones, the banks were committed to lend until September 1,1952, up to $300,000 with interest at 4 percent per annum payable monthly. Covenants were made as to continuation of plaintiff’s management. Bartolo executed a subordination agreement, whereby it agreed that the $2,250,000 debt due it from plaintiff would be subordinated to the debts to the banks.
22. On September 28, 1952, Bartolo sold to plaintiff an additional 9.6 acres of cemetery land at a price of $563,740, payable in 10 or less annual installments without interest.[5] The land was either fully developed or to be fully developed at the seller’s expense. The purchase price was computed by using the 50 percent and 60 percent figures agreed upon in the letter agreement of November 1,1950. At the time of sale Bartolo’s basis for the 9.6 acres was $50,408.
23. In addition to the 1,803.75 acres Bartolo acquired from Central in April 1951, it purchased an additional total of 257.50 acres of vacant land from unrelated third persons in 1951 and 1952 for which it paid $390,000.
24. On December 1,1952, John D. Gregg, plaintiff’s president, informed the Board of Trustees that negotiations had been proceeding for the purchase of Bartolo’s outstanding stock. He told them that a fixed price would not be set, but that the price, payable in percentages of gross sales, would be *28 geared to the proceeds of the sales recovered by plaintiff from the Bartolo property. A draft of the agreement of sale was unanimously approved and Gregg and Sloan were authorized to execute the contract for the purchase of Bartolo’s stock.
The December 1,1952 Agreement Between Plaintiff and Bartolo’s Shareholders
25. On December 26,1952, plaintiff entered into an agreement (effective 12/1/52) with the Bartolo shareholders to obtain their entire stockholdings in that company. As of December 1, 1952, the following were both the directors of Bartolo and the sole trustees of plaintiff: A. Wardman, John D. Gregg, W. A. Johnson, J. L. Seppi, G. W. Sloan, L.E. Bancroft, and R. L. McNitt, Jr. The Bartolo stockholders and their holdings as of December 1,1952 were as follows:

Shares Percent

A. Wardman_ 3, 806% 2. 52
J. D. Gregg- 59, 500 39. 40
William A. Johnson, individual_ 25, 950
William A. John-
_ son, trustee_ 15, 294
_ Six Johnson Trusts. 2, 400 Margaret J.
Corkett, Johnson daughter_ 7.00
Margaret J.
Corkett, trustee.- 3, 625 Frances J. Fuller,
Johnson daugh-ter_ 700
Frances J. Fuller,
trustee_ 3, 625
52, 294
J. L. Seppi- 12, 286
G. W. Sloan_ 4, 690%
L. E. Bancroft_ 16, 938
R. L. McNitt_ 1, 510
34.-63
8. 13
.3. 10
11. 22
1. 00
Total.. -- 151,025 100
*29 The only two individual shareholders in Bartolo who did not become trustees of the plaintiff were F. Fuller and M. Corkett, the daughters of W. A. Johnson.
26. The agreement referred to in finding 25, above, contained the following provisions, set forth under the captions indicated below:
Recitals
(1) Bartolo Company (hereinafter called “Bartolo”) is a California corporation. It owns buildings, improvements, and land comprising and adjacent to the cemetery operated by the Association.
(2) The Association is a non-profit California cemetery corporation which has operated a cemetery known as Rose Hills Memorial Park since November 1, 1950. The Association has been classified as an exempt corporation under Section 101(5) of the Internal Revenue Code.
(3) Effective as of November 1, 1950, Bartolo assigned to the Association all of its right, title, and interest in and to that certain agreement dated May 19,1944 between Bartolo and Rose Hills, Inc., a non-profit California corporation, custodian of the Endowment Care Fund for Rose Hills Memorial Park, and the Association assumed all obligations of Bartolo under said agreement.
(4) On July 1,1951, but effective as of November 1, 1950, Bartolo and the Association executed an agreement relating to the purchase, leasing, and use of certain portions of the land, buildings, improvements, and equipment owned by Bartolo but required by the Association in the operation of a general cemetery business.
(5) Bartolo has 151,025 shares of common stock, all of one class, outstanding. Sellers are the owners of all of said outstanding stock of Bartolo.
(6) Sellers desire to sell to the Association, and the Association desires to buy from Sellers all of said outstanding shares of common stock of Bartolo owned by Sellers. Association believes that the immediate acquisition of said shares of stock will enable the Association to meet and dispose of the three following major problems with which it is confronted, to wit:
(a) insure that its substantially increased needs for land for cemetery purposes will be taken care of for the future;
*30 (b) give the Association protection in the acquisition of buildings and equipment needed in the conduct of the cemetery business, which equipment the Association does not now have; and
(c) make available to the Association indirectly additional capital to enable it to operate,_ develop, and grow in accordance with presently indicated trends.
SectioN I. Definitions
For all purposes of this Agreement, unless the context otherwise requires:
A. “Endowment Care Deposits” shall mean those payments set aside with the Custodian of the Endowment Care Fund, except that for the purposes of this Agreement, said deposits shall not exceed 15% of the aggregate annual gross selling price of grave spaces, crypts, underground crypts, and niches, provided that in no event shall said deposits be less than the minimum prescribed by law.
B. “Custodian” shall mean Rose Hills, Inc., a nonprofit California corporation, its successors and assigns, the custodian of the Endowment Care Fund.
C. “Endowment Care Fund” shall mean the aggregate of the funds held by the Custodian, the use of which is governed by the California Health and Safety Code and which was formerly known as “perpetual care.”
D. “Mausoleums” shall mean the mausoleums designated as Mausoleum No. 1 and Mausoleum “El Portal de la Paz” (sometimes referred to as Mausoleum No. 2), respectively, now located at the cemetery, as well as any additions to said mausoleums, or either of them, and any other mausoleums, buildings, structures or crypts placed upon such land, which may hereafter be constructed at the cemetery upon land now owned by Bartolo, used, or intended to be used, for the interment of human remains.
E. “Columbariums” shall mean the columbariums now located at the cemetery, as well as any additions to said columbariums, or any of them, and any other colum-bariums, buildings or structures which may hereafter be constructed at the cemetery on land now owned by Bartolo, used, or intended to be used, for the interment of cremated human remains.
F. “Underground Crypts” shall mean adjoining crypts below the surface of the ground, not enclosed in *31 a building, and used, or intended to be used, for the entombment of uncremated human remains.
G. “The Cemetery” shall mean the properties now or heretofore owned by Bartolo which have been dedicated for cemetery purposes and/or as to which cemetery permits have been issued, or which may hereafter be so dedicated or permitted, and the buildings and improvements thereon used in, or in conjunction with, the cemetery business being carried on by the Association.
H. “Gross sellingprice” shall mean:
(1) In the case of grave space, gross billings for sales thereof, excluding therefrom only Endowment Care Deposits and any amount credited to the gross billing on account of grave spaces, niches, crypts, or underground crypts exchanged in connection with such sales;
(2) In the case of niches and/or crypts, gross billings for sales thereof, excluding therefrom only Endowment Care Deposits and any amount credited to the gross billing on account of grave spaces, niches, crypts, or underground crypts exchanged in connection with such sales;
(3) In the case of underground crypts, gross billings for sales thereof, excluding therefrom only Endowment Care Deposits and any amount credited to the gross billing on account of grave spaces, niches, crypts, or underground crypts exchanged in connection with such sales;
(4) In the case of real property, or any interest or estate therein (except as described in subpara-graphs (1), (2), and (3) of this paragraph H), gross billings for sales thereof, or gross rentals, royalties, or other amounts received and attributable thereto, whether received in cash or in kind.
I. “Purchase Price” shall mean the aggregate amounts to be paid to Sellers by the Association under the terms hereof.
SeotioN II. Representations, Warranties, and Covenants
# * # * #
B. Affirmative covenants of the Association:
(1) The Association represents, warrants, and covenants that at the date hereof, and so long as any amount is payable to or may become payable to Sellers:
*32 (a) It is a non-profit cemetery corporation, duly organized and existing under the laws of the State of California, ana that under date of August 27,1952, the Commissioner of Internal Revenue of the United States ruled that it is an exempt corporation under the provisions of Section 101 (5) of the United States Internal Revenue Code.
(b) It is conducting, operating, and maintaining, and will continue to conduct, operate, and maintain a cemetery business at and from the cemetery only, including the selling of grave spaces, crypts, underground crypts, niches, concrete boxes, burial vaults, memorials, flowers, entombments, niche inumments, cremations, cremation containers, and the charging of fees for all services incidental to the disposition of dead human remains.
(c) It will continue to operate as a non-profit cemetery corporation; will not amend its charter, or cause or permit its charter to be amended, in any manner that would cause or permit it to lose its status as a non-profit cemetery corporation under the laws of California; will amend, or cause to be amended, its charter to the extent, if any, hereafter necessary in order to preserve its status as a non-profit cemetery corporation under the laws of California, and will operate in such maimer as to assure, to the extent that the same is within the control of the Association, that it will continue to qualify as an exempt corporation under the provisions of the United States Internal Revenue Code.
(d) It is making and will continue to make charges in connection with the establishment, maintaining, operating, improving, and conducting its cemetery business, interring human remains, and the care, preservation, and embellishment of cemetery property.
(e) It will, to the fullest extent economically feasible and practical for its operation, use ail land, buildings, or other properties which it has acquired or may hereafter acquire from Bartolo for cemetery purposes.
(f) On all sales of grave space, crypts, underground crypts, and niches, it will collect from the purchasers thereof Endowment Care Depos *33 its and will pay said deposits to the Custodian, as provided and required by the California Health and Safety Code.
(g) It will expend for the purpose of preserving and maintaining the cemetery, when and as necessary, all income from the Endowment Care Fund received from the Custodian, and may expend such other amounts received from other sources as may be necessary for the purpose of such preservation and maintenance provided, however, that the Association shall be the sole judge in determining what is desirable or necessary for such preservation and maintenance, and its decision in that regard shall be final.
(h) It will maintain and preserve its corporate existence and all rights, franchises, and other authority adequate for the conduct of its business; maintain its properties, equipment, and facilities in good order and repair; and conduct its cemetery business in an orderly manner without voluntary interruption (excluding labor disputes), and, except as elsewhere herein permitted, not change the type or character of its business.
(i) It will maintain on all of its real and personal property adequate insurance in good and responsible insurance companies against fire and other risks to the extent reasonable and prudent in the conduct of its business; and fully insure in responsible insurance companies against liability arising out of or in connection with the conduct of its business.
(j) It will duly and punctually pay and discharge, before the same become delinquent and before penalties accrue thereon, all taxes, assessments, and governmental charges upon or against it or any of its properties, and all its other liabilities at any time existing, except to the extent that, and so long as (i) the same are being contested in good faith and by appropriate proceedings in such manner as not to cause any materially adverse effect upon its financial condition or the loss of any right of redemption from any sale thereunder, and (ii) it shall have set aside on its books reserves (segregated to the extent required by sound account *34 ing practice) deemed by it adequate with respect thereto.
(k) It will maintain a standard and modern system of accounting in accordance with generally accepted accounting practice; cause Bar-tolo to do the same; and will maintain for inspection by Sellers at its offices:
(i) As soon as available, and in any event within 120 days after the end of each fiscal year of the Association, a balance sheet of the Association and of Bartolo as of the end of such fiscal year and statements of income and surplus of the Association and of Bar-tolo for such fiscal year, all in reasonable detail and certified by independent public accountants of recognized standing secured by the Association.
(ii) Within 120 days after the end of each fiscal year of the Association, a certificate of the President or Treasurer of the Association, stating that to the best of his knowledge and belief the Association has performed and observed each and every covenant contained in this Agreement on the part of the Association to be performed, and that no event then exists which constitutes an event of default thereunder or would constitute such event of default upon the lapse of time or upon the giving of notice and the lapse of time, specified therein; or if any such default or event exists, specifying the nature thereof, of which the signer of such certificate may have knowledge.
(l) It will promptly advise Sellers in writing of the existence of any event of default or of any event which would become an event of default upon the lapse of time or upon the notice and lapse of time specified in this Agreement.
(m) It will cause Bartolo to observe, on its own behalf, the representations, covenants, and warranties set forth in subsections (i) and (j) of this subparagraph (1) of paragraph B.
C. Negative covenants of the Association:
(1) The Association represents, warrants, and covenants that so long as any amount is payable *35 hereunder or may become payable hereunder, it will not do any of the following:
(a) Make any material change in the type or character of its business as the same presently is being conducted, except such changes as may be made in order that the type or character of its business will conform with that which is being conducted by other comparable organizations in Southern California. _
_ (b) Sell, lease, or otherwise dispose of, or cause, suffer, or permit Bartolo to sell, lease, or otherwise dispose of land, improvements, buildings, machinery, equipment, dioses in action, water rights, mineral rights, or other property except in the ordinary course of the Association’s business of operating the cemetery or Bartolo’s business incidental thereto, unless the Association shall in good faith determine that as to any transaction it would be impractical, economically not feasible, and detrimental to the best interests of the Association and Sellers to observe this covenant; provided that such determination as to any transaction shall not constitute a determination as to any other transaction.
(c) Create, assume, or suffer to exist any mortgage, pledge, encumbrance or lien or charge of any kind upon any property or other assets now owned or hereafter acquired by it; provided, however, that this restriction shall not be applicable to nor prevent:
(i) Liens for taxes or assessments or for mechanics’ or materialmen’s claims; or liens or deposits in connection with workmen’s compensation insurance, social security obligations, or other similar charges, all arising in the ordinary and normal operation of its cemetery business if the same are not overdue or; if overdue, are being contested in good faith and by appropriate proceedings in such manner as not to affect adversely its financial condition;
(ii) Liens or deposits in connection with surety, stay, or appeal bonds, or deposits required by law or governmental regulation or by any court order, decree, or judg *36 ment as a condition to the transaction of business or the exercise of any right, privilege, or license reasonably necessary in the transaction of its business;
(iii) Zoning restrictions, easements, licenses, restrictions on the use of real property or minor irregularities in title thereto, which do not materially impair the use of such property in the operation of its business or the value of such property for the purpose of such business;
(iv) Liens or encumbrances on property now owned by the Association or hereafter acquired by it if the Association shall in good faith, and prior to the creation thereof, determine that neither the creation thereof, the acquisition and use of funds thereby, nor the repayment thereof, would be detrimental to the best interests of Sellers hereunder; provided, that any such determination by the Association shall be formally expressed in the minutes of the trustees of the Association; and provided further that if (aa) the Association shall at any time hereafter desire to incur indebtedness and shall be required as a condition thereof to obtain a subordination of its obligations to Sellers hereunder to said proposed indebtedness, Sellers agree that such indebtedness may be incurred and such subordination may be effected and shall be binding upon all of them if 51 per cent in interest of Sellers consent in writing thereto; and (bb) the Association shall at any time hereafter desire to defer, in whole or in part, payment of amounts due on its obligations to Sellers hereunder, Sellers agree that such postponement may be effected and shall be binding upon all of the Sellers if 51 per cent in interest of Sellers consent in writing thereto.
(d) Purchase any securities, other than those covered by this Agreement nor make any investment in the securities or business of, or loans or. advances to; any person or other entity, except in the ordinary and normal operation of its business; or guarantee or otherwise become liable upon the obligation of any person or *37 other entity except' by endorsement of negotiable instruments for deposit or collection in the ordinary and normal course of its ¡business.
(e) Liquidate or dissolve, or commence any proceedings therefor.
(f) Cause, suffer, or permit Bartolo to. do, permit to be done, or authorize any of the things enumerated in the foregoing subsections (a) through (d) of this subparagraph (1) of paragraph C, except to the extent that the Association is permitted to do them.
D. The affirmative and negative covenants set forth in this Section II are for the benefit of Sellers and the Association, and are not for the benefit of any third party.
*****
SECTION IV. PAYMENT OK PURCHASE PRICE
A. The Association will pay to the Sellers for the shares of common stock, the purchase and sale of which is provided for by this Agreement, a purchase price determined as follows:
(1) Thirty per cent (30%) of the gross selling price of grave spaces hereafter sold by the Association in or upon real property now or heretofore owned by Bartolo.
(2) Ten per cent (10%) of the gross selling price of niches and/or crypts, hereafter sold By the Association in any mausoleums and/or colum-bariums.
(3) Twenty-five per cent (25%) of the gross selling price of underground crypts designed for one entombment; and twenty per cent (20%) of the gross selling price of underground crypts designed for two or more entombments hereafter sold by the Association in or upon real property now or heretofore owned by Bartolo.
(4) On the sale, leasing, or other disposition of real property, or any estate or interest therein, whether made 'by the Association or Bartolo (other than as described in subparagraphs (1), (2), and (3) of this paragraph A, and other than sales, leases, or other dispositions by Bartolo to the Association) :
(a) 50% of gross rentals, royalties, or other amounts received for the use of such real property, or estate or interest therein;
*38 (b) Except as provided in subparagraph (c) hereof, on sales or exchanges of real property the following percentages of the gross selling price (which, in case of an exchange, shall mean the market value of the property acquired on the exchange):
(i) During the first five years after the date of this Agreement, 90%;
(ii) Commencing with the sixth year after the date of this Agreement and until the end of the fifteenth year, 80%;
(iii) Thereafter, 75%.
(c) In the case of exchanges for property similar or related in service or use, or potential service or use, to the property exchanged, and in the case of sales made within 90 days of the purchase by the Association, or Bartolo, of property similar or related in service or use, or potential service or use, to the property so sold, the acquired property shall, for the purposes hereof, upon such acquisition become a part of the cemetery, shall thereafter be deemed to be “property now or heretofore owned” by Bartolo, and no payment shall be made to Sellers in connection with any such exchange or sale.
B. Payments to Sellers upon the purchase price, to the extent that the same is determined in the manner specified in subparagraphs (1), (2), and (3) of paragraph A of this Section IY, shall be made not less often than semiannually from the amounts accrued on gross billings upon which final collection has been received; and to the extent that the same is determined in the manner specified in subparagraph (4) of paragraph A of this Section IY, not less often than semi-annually from each payment on account of gross billings therefor. Such payments need not, however, exhaust the amounts then accrued, but shall be made in amounts which will, as nearly as feasible, exhaust said accruals.
C. Payments on the purchase price shall be made by the Association at the times prescribed in the preceding paragraph B direct to Sellers. Unless the Association shall have received written notice of a change of address of a Seller such payments shall be mailed to the Seller’s address as set forth in Section VII, paragraph B hereof. If any Seller shall have transferred, whether voluntarily or by operation of law, to another or other persons all or any portion of his interest hereunder, such payments shall be made by the Association as follows:
*39 (1) If written notice of such transfer has not been received by the Association on or before fifteen days preceding the then current payment date, to the person or persons then appearing on the Association’s records as the holder of the interest;
(2) If written notice of such transfer has been received by the Association on or before fifteen days preceding the then current payment date, to the person or persons designated in such written notice.
The Association shall be discharged from any further liability as to any such payment if the same is made as provided in this paragraph C. If in any case the Association is in doubt as to the person or persons entitled to receive any such payment it may refuse to make the same until such time as it has received written instructions, satisfactory to the Association in form and substance, as to the person or persons entitled to such payment, and the Association shall not be liable for interest, penalties, or surcharge of any kind for failure or refusal to make any payment prior to receipt of such satisfactory instructions.
SectioN V. General Provisions
A. This Agreement may be modified or amended by written consent of the Association and at least 51% in interest of Sellers. In determining said 51%, any interest of any of Sellers which shall have been acquired, directly or indirectly, by the Association or Bartolo, and which is then owned, directly or indirectly, by the Association or Bartolo, shall not be considered as a Seller’s interest.
B. Waiver by Sellers, or any of them, of the breach of any of the terms or conditions hereof shall not be deemed to be a waiver of any subsequent breach of the same or any other term or condition. Any consent by the Sellers, or any of them, to any amendment or modification of this Agreement or any of the terms or provisions thereof shall not constitute a consent to any other or subsequent modification or amendment.
C. Time is of the essence hereof.
I). Provision is made herein for payment of the purchase price measured in part by the sale of grave spaces, niches, underground crypts, and crypts in land heretofore purchased by the Association from Bartolo, or in buildings or structures which may hereafter be erected by the Association at its own expense. Such provision, and the percentages utilized herein for determining the amount of the purchase price, have been determined in such a way as to measure a fair, just, and reasonable *40 purchase price to be paid to Sellers for their stock in Bartolo, and in recognition of the value of the use which may be made by the Association of properties which it has heretofore acquired or may hereafter acquire from Bartolo.
SeotxoN VI. Default
A. This Agreement provides for the payment of the purchase price by the Association to the Sellers in an amount not presently determinable and over a period, the duration of which cannot presently be determined. It is recognized and agreed that it would be impracticable or extremely difficult to fix or determine the actual damage to the Sellers resulting from any material breach of this Agreement by the Association. The Association and the Sellers therefore agree that in the event of material breach by the Association of this Agreement, the Sellers, at their option and in addition to any other remedies that they may have, for such breach, may after ten days’ written notice of such breach, signed by not less than 51% in interest of Sellers, specifying the particulars therof, and the failure by the Association to remedy said breach within said period, do, or cause the following to be done:
(1) Immediately demand and receive, payment in full of any amounts due hereunder but not paid.
(2) If Bartolo shall at that time still be in existence, demand and receive from the Association the shares of stock of Bartolo the sale of which is herein provided for and the reconveyance and delivery of all real property theretofore acquired by the Association from Bartolo and not theretofore sold or contracted to be sold by the Association.
(3) If Bartolo shall not longer be in existence, demand and receive from the Association any and all properties theretofore acquired by the Association from Bartolo and not theretofore sold or contracted to be sold by the Association, together with any and all contracts, accounts receivable, notes receivable, or other dioses in action then held by the Association but attributable to or derived from, directly or indirectly, properties theretofore acquired by the Association from Bartolo.
(4) Sellers shall be fully entitled to retain and keep, without any claim whatsoever thereagainst by the Association, all amounts of the purchase price theretofore paid by the Association.
*41 B. A material breach of this Agreement, by the Association shall be deemed to have occurred if:
(1) The Association shall default in payment of any installment of the purchase price, and such default shall not have been cured within the period of notice hereinabove provided; and/or
(2) There shall have occurred any breach by the Association of any of its warranties or representations, as set forth in Section II hereof.
27. A non-profit cemetery customarily commences operations without any substantial capital in the sense that it has no substantial funds of its own, and normally acquires its assets principally on credit. In California, non-profit cemeteries have over the years usually and customarily acquired their assets by paying a purchase price computed as a percentage (not over 50%) of gross sales of interment spaces made out of the acquired land. This has been customary because newly-formed non-profit associations find it difficult to borrow money from financial institutions because they have no credit background and because dedicated cemetery land is not regarded as desirable collateral by lending institutions. Such credit problems confront non-profit associations acquiring an operating cemetery as well as those acquiring undeveloped land.
28. Plaintiff never suggested or attempted to place an overriding ceiling figure on the amount that the transferors would receive; the record shows that the amount the transferors would receive was never computed in 1952. Valuations and determinations as to amounts payable under the contract did not occur until 1967 in connection with this litigation.
29. By virtue of their status as trustees, findings 15 and 25, supra, the former Bartolo shareholders who were the sellers under the December 1, 1952 agreement assumed and retained effective control over plaintiff’s affairs. They uniformly met their fiduciary obligations under California law. It happened that their duty as trustees coincided with their interests as holders of an equity interest in plaintiff.
30. Of the total acreage conveyed to plaintiff under the December 1952 agreement, only 192.61 acres were legally dedicated to cemetery use and were available for develop- *42 went and. sale for that purpose* Because of its dedication, it is concluded that the fair market value of this acreage should be calculated in terms of its use for cemetery purposes.
31. As the cemetery property acquired 'by plaintiff had been theretofore operated, one gross acre yielded 1135 grave spaces and such spaces were sold at the rate of 12,500 per year. The evidence establishes a reasonable expectation that as of 1952 a net sales price of $160 would be realized by plaintiff for each grave space. See finding 57 infra. In addition, the evidence shows that plaintiff’s annual dollar volume of sales of mausoleum crypts and niches would consistently approximate 7 percent of its dollar volume of grave space sales for the same year. Finally, the evidence shows that plaintiff would realize an additional net profit of not less than $125 from sales of markers, flowers, openings and closings, etc. from each interment on the property.
32. Employing the criteria stated in findings 30 and 31, supra, the December 1, 1952 fair market value of the 192.61 acres referred to in finding 30, supra, was $9,787,078; that figure being the present value (using a 7 percent present worth factor) of the net receipts to be predictably realized by plaintiff from the 192.61 acres over a period of 17(4 years.
33. The evidence further shows that on December 1, 1952 the 1,962 acres acquired by plaintiff and not dedicated to cemetery use had a cash value, principally for subdivision and light industrial purposes, on the then-current market of not less than $665,000.
34. Accordingly, on December 1,1952 the land transferred to plaintiff by the Bartolo shareholders by the agreement of that date, had a fair market value of not less than $10,452,000.
35. As heretofore noted, finding 31, supra, the evidence reveals a 1952 sales price of about $160 per grave and a sustained average rate of 12,500 grave sales per year plus mausoleum crypt and niche sales consistently approximating 7 percent of the dollar volume of annual grave sales. Under the purchase price percentage provisions of the December 1, 1952 agreement, as applied to the factual premises established by all of the evidence adduced in this case, and assuming that the $160 sale price remained constant, the former Bartolo shareholders collectively expected to receive a total of $615,- *43 000 per year for the 200-year period required to fully liquidate the beginning inventory of 2,444,000 gravesites at a rate of 12,500 sales per year. But the sale price did not remain at $160 per lot, instead, it rose to $243 by 1968, a rise of 52 percent, as shown in finding 57. Naturally, this substantially increased the total potential payout.
OperatioNS From December 1, 1952 to 1961
36. After plaintiff acquired Bartolo’s stock in 1952, it proceeded as fast as John Gregg could make the development plans go. In 1952, the trustees envisaged expenditure of millions of dollars on development projects. The planned development began in 1954 and expenditures totaling about seven and three-quarter million dollars were made for the following through 1966:
Construction and improvement of administrative and mortuary buildings and sites
(195A-1963)_$2, 637,000
Development of hill land (1956-1965)_ 4,186,000
Construction of hillside chapel (1954-1958)_ 401,000
Construction of memorial chapel (1962-1966)_ 445,000
Total_ 7,669,000
37. On December 1, 1954, plaintiff and Bartolo entered into a credit agreement with Security and Citizens Banks. The May 14, 1951 loan agreement as amended January 10, 1952, was cancelled. The two notes of January 10, 1952 having a total outstanding balance of over $450,000 were amended pursuant to the terms of the present agreement.
Security committed itself to lend up to one million dollars and Citizens up to $500,000, at 4 percent interest until January 1, 1956 to either plaintiff or Bartolo.[6] Bartolo and plaintiff guaranteed payment of all notes of the other company and they executed a joint instrument to that effect.
*44 The borrowers further agreed to subordinate plaintiff’s obligation under the 1952 agreement to the prior payment of the notes and prior discharge of all liabilities and obligations of plaintiff under the above-mentioned guarantee agreement.
Further, the borrowers agreed to perform the 1952 agreement without any change in the terms or provisions thereof. If payments under this agreement exceeded $120,000 for any fiscal year, the two corporations agreed to promptly make a payment on their respective notes in an amount equal to such excess.
The borrowers also promised not to engage in any business other than the cemetery operation, nor make-any material change in the executive management. Kestrictions were also placed upon obtaining financing from other sources and on paying dividends.
38. On December 1, 1954, plaintiff, the former Bartolo shareholders (transferors) and the two banks entered into a subordination and deferral of payment agreement, pursuant to such covenants under the December 1, 1952 agreement (finding 26, supra). The transferors’ claims were subordinated to the banks’ preferential indebtedness to the extent of $2,500,000 on all obligations of plaintiff to the banks then existing or subsequently incurred, with all such notes due by December 1, 1969 at a maximum of 1 percent interest.
The agreement further provided that plaintiff would make payments to the transferors under the 1952 contract up to $120,000 annually, provided that no event or condition existed or would result by reasons of making the payments proposed that would constitute a default under the bank credit agreement. Additional payments would be subject to plaintiff’s 'best judgment.
Further, the transferors agreed not to declare a default under the December 1, 1952 agreement for any reason, nor to sell their interests not subject to the present agreement. All of the Bartolo shareholders who were parties to the 1952 agreement were parties to the 1954 agreement.
The credit agreement was necessary in order that plaintiff might borrow funds needed to conduct the business of the *45 cemetery. The transferors, who were the signatories to the December 1,1952 agreement, consented to the partial deferral of payments without interest and to the subordination.
39. The trustees frequently discussed the subject of the extensive development projects which included the grading of bill lands. Although the grading of 633 acres could have been stretched out, the trustees concluded it was impractical as there was the necessity of developing the property and maintaining an inventory of developed property at least 3 to 4 years ahead of customer demand. Accordingly, the trustees voted unanimously to continue the grading project.
In fact, a large part of the grading was undertaken prematurely from an economic standpoint. Although by 1956 plaintiff was first able to make sales of property in the area that was the subject to its first 633 acres of grading, by 1966, after sales of 61 acres of the property and some 7,600 grave spaces, 45 years of grave space inventory was still available from the 633 acres.
40. Other factors also contributed to plaintiff’s cash pinch, which began in 1955 and continued into the early parts of the 1960’s. The pre-need selling and consequent accounts receivable presented a cash demand for immediate sales commission expenses on these deferred sales. The cash shortage existed despite the fact that by the December 1, 1954 credit agreement with Security and Citizens Banks (as amended May 26, 1956) plaintiff obtained a two-million dollar credit line. This was not adequate to fund the development program, the major expense being the grading of 633 acres of hill land.
41. Once the trustees determined to continue the extensive development project, they had one alternative left, and that was to secure some relief from the creditors in the purchase price. Thus, plaintiff commenced negotiations sometime late in 1957 with the creditors of the Bartolo contract in an attempt to reduce the price from 30 to 20 percent on grave sales and other percentage reductions. Up until his death in late 1959, John Gregg conducted the negotiations with the other former Bartolo shareholders (transferors), including the United California Bank (UCB) which held a 24 percent interest as trustee of W. A. Johnson’s Estate.
*46 42. On December 27, 1957, Gregg wrote similar letters to both S. Fuller, trustee for the Corkett Trust, and UCB. He informed them that amending the December 1,1952 contract had been discussed and he implored them to agree to the proposed modification of the contract. In support thereof, Gregg wrote that payments to the transferors under the contract were impossible to fulfill. Gregg explained plaintiff’s financial reports demonstrated that it could not possibly meet the contractual provisions. By September 30,1965, after payment on the contract of $3,130,000, there would be due, but unpaid, $4,542,000. Even then, plaintiff would need substantial loans and would have to cut back on its development. Further Gregg pointed out “ [i]t is to the best interest of the former shareholders that we have a strong Association [plaintiff].”
43. In the early part of 1958, UCB very strenuously resisted the proposed modification. Frequent correspondence between Gregg and UCB produced wide discrepancies as to the terms. Gregg rejected numerous counter-proposals made by UCB. As to UCB’s proposed elimination of the percentage reduction after 20 years, Gregg replied that it seemed “folly to provide now for something that no one except perhaps, yourself believes has any reasonable chance of occurring 20 years from now.” As to UCB’s proposal for payment of interest on the accrued liability, Gregg replied that “the Association [plaintiff] simply could not undertake to pay that additional obligation.” In attempting to convince UCB to acquiesce to the terms of the proposed amendment, Gregg wrote—
Again, may I point out to you that our real purpose in suggesting an amendment is to increase current payments to the unit holders (creditors). In other words, to put something in their pockets now, and this something to be substantially more than they would hope to get within the foreseeable future under the present arrangement.
44. Despite the opposition of UCB, Gregg, Wardman, Seppi, Bancroft, McNitt, and Sloan expressed a willingness to reduce the payments mider the contract and in the spring of 1958 they agreed to the amendment. On May 19, 1958, *47 plaintiff’s trustees approved tlie amendment and resolved that since more than 51 percent of the creditors in interest had agreed to the amendment, the 51 percent requirement provided in the December 1,1952 contract had been met and the amendment was to be effective June 1,1958. On May 21, 1958, John Gregg wrote to UCB and advised them of the signed and effective amendment.
UCB claimed that the 51 percent clause in the December 1, 1952 agreement was not binding on them and threatened to sue plaintiff. Negotiations continued in the hope that serious litigation could be avoided and plaintiff would be able to get the unanimous approval for the reduction.
45. On February 20, 1958, a final order of condemnation was entered awarding plaintiff the one-half acre Bossan property that it had resolved to acquire in 1956 through the exercise of its power of eminent domain.
46. On April 8, 1958, plaintiff purchased 180 acres of land known as the Pellessier property. The purchase price was $161,500. The property was not acquired specifically to provide more grave spaces, but about half the acreage could be used for such. The entire 180 acres were dedicated for cemetery use in 1961.
In addition to the Pellessier and Rossan acquisitions, plaintiff purchased an additional 30 acres in 1955 and 1956.
47. On September 23, 1959, John Gregg died. McNitt was elected president and together with Sloan continued negotiations with UCB. Finally in 1961, an agreement was reached with UCB and 100 percent of the creditors agreed to the amendment of the December 1,1952 contract, effective June 1958 and dated July 17,1961.
48. The agreement referred to in the preceding finding provided as follows:
Amendment to Agreement Covering Acquisition by Rose Hills Memorial Park Association oe Stock of Bartolo Company
This is an agreement effective June 1, 1958, between ROSE HILLS MEMORIAL PARK ASSOCIATION, a non-profit California cemetery corporation (“Association” herein) and the persons, or their successors, who were parties to the Agreement dated December 26,1952, *48 the other party to which was the Association and which covered the acquisition by the Association of stock of. Bartolo Company, said persons referred to herein, collectively, as “Sellers”.

Recitals

A. On December 26, 1952, but effective as of December 1, 1952, the Association entered into an agreement (the “Bartolo Contract” herein) with Sellers or their predecessors in interest who were the then owners of all of the issued and outstanding shares of stock of Bartolo Company, a California corporation, for the purchase by the Association of all of said shares of stock of Bartolo Company.
B. Pursuant to the provisions of the Bartolo Contract the Association acquired ownership of all of the shares of stock of Bartolo Company, and became obligated .to Sellers to pay therefor a purchase price defined and described in the Bartolo Contract.
C. The Bartolo Contract contains restrictions oh the right of the Association to acquire, develop, sell or otherwise dispose of real property, which restrictions have proved to be unduly burdensome and not in the best interests of either the Association or the Sellers.
D. In order to enable the Association to fulfill its obligations under the Bartolo Contract, and to best assure the orderly payment of the purchase price without hampering the proper development of the cemetery, the percentages of gross selling price, as defined in the Bartolo Contract, payable to the Sellers should be reduced for at least a period of years, the consideration for such reduction being the undertaking of the Association to pay amounts to the Sellers to which they would not otherwise be entitled under the Bartolo Contract. Said adjustments have been made desirable and necessary as the result of circumstances which have arisen and events which have occurred which were not contemplated at the date of the Bartolo Contract and which could not reasonably have been anticipated by the parties at said date and which have made it impossible for the Association to perform its obligations under the Bartolo Contract without the modifications herein set forth.

Agreement

Now, therefoRe, the Bartolo Contract is amended in the following particulars:
First: Paragraph G of Section I is hereby amended to provide as follows:
*49 G. “The cemetery” shall mean the properties now ■or heretofore owned by Bartolo, and such additions • thereto as have been or may hereafter from time to time be made by the Association adjacent, adjoining, or contiguous to, or abutting upon such properties, and which have been dedicated for cemetery purposes or as to which cemetery permits have been issued, or which may hereafter be so dedicated or permitted, and the buildings and improvements thereon used in, or in conjunction with, the cemetery business being carried on by the Association. Without .limiting the generality of the foregoing provision, there shall be included as a part of the cemetery that certain property, consisting of 180 acres, more or less, commonly known as the Pellissier property, adjoining the cemetery on the northeast, negotiations for the purchase of which have been undertaken by the Association. As part of the consideration for this amendment the Association agrees to proceed in due course and with reasonable diligence to obtain ownership of said property and to develop the same for cemetery use, subject to the payment requirements of this Agreement.
Second: Subsection (k) of subparagraph (1) of paragraph B of Section II is hereby amended to provide as follows:
(k) It will maintain a standard and modern system of accounting in accordance with generally accepted accounting practice; cause Bartolo to do the . same; and will maintain for inspection by Sellers at its offices:
(i) As soon as available, and in any event within one hundred twenty (120) days after the end of each fiscal year of the Association, a balance sheet of the Association and of Bartolo as of the end of such fiscal year and statements of income and surplus of the Association and of Bartolo for such fiscal year, all in reasonable detail and certified by independent certified public accountants of recognized standing secured by the Association.
(ii) Within one hundred twenty (120) days after the end of each fiscal year of the Association, a certificate of the President or Treasurer of the Association, stating that to the best of his knowledge and belief the Association has performed and observed each and every cove *50 nant contained in tills Agreement on the part of the Association to be performed, and that no event then exists which constitutes an event of default thereunder or would constitute such event of default upon the lapse of time or upon the giving of notice and the lapse of time, specified therein; or if any such default or event exists, specifying the nature thereof of which the signer of such certificate may have knowledge.
Upon written request addressed to the Association by the holder or holders of ten per cent (10%) or more in interest hereunder, the Association will furnish to such person so requesting quarterly statements of sales by it during the preceding fiscal year of property subject to this Agreement on which percentages are to be paid, such statements to be mailed within one hundred twenty (120) days following the receipt by the Association ox such written request.
Third: Subsection (a) of subparagraph (1) of paragraph C of Section II is hereby amended to provide as follows:
(a) Make any material change in the type or character of its business as the same presently is being conducted, except such changes as may be made in order that the type or character of its business will conform with that which is being conducted by other comparable organizations in Southern California; or purchase or otherwise acquire or develop any real property unless the same shall adjoin, abut upon, or be contiguous to the cemetery as it may now exist or may from time to time hereafter exist.
Fourth: Paragraphs A and B of Section IV of the Bartolo Contract are amended to provide as follows:
A. The Association will pay to the Sellers for the shares of common stock the purchase and sale of which are provided for by this Agreement a purchase price determined as follows:
(1) Thirty per cent (30%) of the gross selling price of grave spaces sold by the Association on and after December 1, 1952 and prior to June 1,1958 in or upon real property owned by Bartolo on or prior to December 1,1952; twenty per cent (20%) of the gross selling price of *51 grave spaces sold by the Association on and after June 1, 1958 and prior to June 1,1978 in the cemetery; thirty per cent (30%) of the gross selling price of grave spaces sold by the Association on and after June.l, 1978 in the cemetery or the amount determined under sub-paragraph (4) of this paragraph A of Section IV, whichever is less.
(2) Ten per cent (10%) of the gross selling price of niches and/or crypts sold by the Association on and after December 1,1952 and prior to June 1, 1958 in any mausoleums and/or columbarimns; seven per cent (7%) of the gross selling price of niches and/or crypts sold by the Association on and after June 1,1958 and prior to June 1, 1978 in any mausoleums and/or cohunbariums; ten percent (10%) of the gross selling price of niches and/or crypts sold by the Association on and after June 1, 1978 in any mausoleums and/or columbariums or the amount determined under subparagraph (4) of this paragraph A of Section IV, whichever is less.
(3) Twenty-five per cent (25%) of the gross selling price of underground crypts designed for one entombment, and twenty per cent (20%) of the gross selling price of underground crypts designed for two or more entombments, sold by the Association on and after December 1, 1952 and prior to June 1,1958 in or upon real property owned by Bartolo on or prior to December 1, 1952; seventeen per cent (17%) of the gross selling price of underground crypts designed for one entombment, and thirteen per cent (13%) of the gross selling price of underground crypts designed for two or more entombments, sold by the Association on and after June 1, 1958 and prior to June 1, 1978 in the cemetery; twenty-five per cent (25%) of the gross selling price of underground crypts designed for one entombment, and twenty per cent (20%) of the gross selling price of underground crypts designed for two or more entombments, sold by the Association on and after June 1,1978 in the cemeterv or the amount determined under subparagraph
(4)of this paragraph A of Section IV, whichever is less.
*52 (4) If the Association shall in good faith determine that the payment, commencing June 1,1978, of the percentages of gross selling prices set forth in the preceding subparagraphs (1), (2) and (3) would, be impractical, economically not feasible, and detrimental to the best interests of the Association and the Sellers, and shall give written notice of such determination to each of the Sellers on or before December 31, 1977, the matter shall forthwith be submitted to arbitration in the following manner:
(a) The Association shall, not later than December 31, 1977, designate one arbiter, which shall be Messrs. Haskins & Sells, Certified Public Accountants, or such other national independent firm of Certified Public Accountants of comparable stature as shall then be pei’forming the periodic audits of the records and operations of the Association or as shall be designated by the Association;
(b) The Sellers shall, not later than January 31, 1978, designate one arbiter, which shall be Messrs. Dybrand, Ross Bros. & Montgomery, Certified Public Accountants, or such other national independent firm of Certified Public Accountants of comparable stature as shall be designated by at least 51% in interest of Sellers excluding for this purpose Sellers who are also Trustees or executive employees of the Association;
(c) The arbiters so designated shall confer, make such examination of the property, records, and operations of the Association as they shall deem advisable, receive such _ testimony and evidence as shall be pertinent, relevant and material, and shall attempt to agree upon (i) percentages of gross selling prices to be payable on and after June i, 1978, which shall be not more than the percentages in effect prior to June 1,1958 nor less than the percentages in effect immediately prior to June 1, 1978; and (ii) the period during which such percentages shall be effective.
(d) If the two arbiters cannot agree they shall select a third arbiter, which shall *53 be a national independent firm of Certified Public Accountants of stature comparable to the other arbiters, and to whom shall be submitted all information, reports, analyses and evidence theretofore submitted to and considered by the first two arbiters. If the two arbiters cannot agree upon a third arbiter they shall forthwith request the then presiding judge of the Superior Court of the State of California, in and for the County of Los Angeles, to designate such an arbiter, who shall meet the qualifications above set forth. The third arbiter shall consider such information, and may request additional information.
(e) The decision of a majority of the arbiters shall be determinative of the controversy and shall establish the percentages and the period of time within the limits specified in the preceding subparagraph (c). Such decision shall 'be rendered in writing to the Association and the Sellers, and shall be binding upon them, subject only to such court approval in the case of fiduciaries then holding interests of Sellers as may 'be permitted by law, which approval Sellers agree to seek with due diligence.
(f) The Association shall pay the fees and expenses of the arbitration.
(g) No firm of certified public accountants shall be qualified to act as an arbiter under the provisions hereof if any member, employee, partner, or executive of such accounting firm who has or has had any responsibility for the conduct of the arbitration, the preparation or examination of any material in connection therewith or any prior audits or examinations of the Association is related within the third de-Sree to any of the Sellers or to any officer, irector, trustee, or executive or administrative employee of the Association or any of the Sellers.
(5) On the sale, leasing, or other disposition of real property, or any estate or. interest therein, whether made by the Association or Bartolo (other than as described in subpara-graphs (1), (2), and (3) of this paragraph A, *54 and other than sales, leases, or other dispositions by Bartolo to the Association):
(a) Fifty per cent (50%) of gross rentals, royalties, or other amounts received for the use of such real property, or estate or interest therein;
(b) Except as provided in subsection (c) hereof, on sales or exchanges of real property the following percentages of the gross selling price (which, in case of an exchange, shall mean the market value of the property acquired on the exchange):
(i) Between December 1, 1952 and November 30, 1957, ninety per cent (90%);
(ii) Between December 1, 1957 and November 30, 1967, eighty per cent (80%);
(iii) Thereafter seventy-five per cent (75%).
(c)In the case of exchanges for real property similar or related in service or use, or potential service or use, and in area, to the real property exchanged, and in the case of sales of real property which are effected as a consequence of or in anticipation of the purchase of other real property adjoining, abutting upon, or contiguous to the cemetery similar or related in service or use, or potential service or use, and in area, to the real property so sold, the acquired property shall, for the purposes hereof, upon such acquisition become a part of the cemetery; provided, however, that:
(i) The Association shall first have determined, by resolution of its Board of Trustees, that the conditions and requirements of this subsection exist and will be met, and that the transaction will promote the most efficient and effective development of the cemetery;
(ii) The Association shall promptly have given written notice to each of the Sellers of such determination by the Board of Trustees;
*55 (iii) The exchange or sale so contemplated shall not be consummated until the expiration of thirty (30) days from the date of the mailing of such written notice to each of the Sellers;
(iy) In the case of sale of property there shall become payable to the Sellers, in lieu of the percentage of gross selling price set forth above in this subparagraph (5), fifty per cent (50%) of the excess, if any, of the gain (as hereinafter defined) realized from such sale over the purchase price of the property purchased. In the case of such a sale in anticipation of purchase of other property, payment of such percentage may be deferred for a period of not to exceed one year from the date of completion of the sale, without interest or penalty; but if the anticipated purchase has not occurred within said one-year period, the percentage herein prescribed shall be paid to the Sellers, subject to the right of the Association to recoup such payment from the Sellers if the replacement property is purchased within five (5) years from the date of completion of such sale. Such recoupment shall be made only out of monies otherwise becoming due and payable to Sellers hereunder. For the purpose hereof “gain” means the excess of the sale price, net of expenses of sale, over the costs incurred for development and improvement of the property to the date of its sale.
B. Payments to Sellers upon the purchase price, to the extent that the same is determined in the manner specified in subparagraphs (1), (2), (3) and (4) of paragraph A of this Section IY of the Bartolo Contract shall be made not less often than quarterly from the amounts accrued on gross billings upon which final collection has been received by the Association; and to the extent that the same is determined in the maimer specified in sub-paragraph (5) of paragraph A of this Section IY, not less often than quarterly from each payment on account *56 received by the Association from gross billings therefor. Such quarterly payments shall be made not later than forty-five (45) days after the end of each fiscal quarter of the Association; provided that such payments need not, however, exhaust the amounts then accrued, but shall be made in amounts which will, as nearly as feasible, exhaust said accruals; and provided further that if at any time after June 1, 1978 the Association is in arrears in payment of any amounts accrued and payable, it will, until such time as the arrearages are eliminated, deposit to a separate account monthly accruals which become payable and report to Sellers the amounts of such accruals and deposits within twenty-five days after the end of each month.
49. After 1961, plaintiff’s cash position improved. Commencing about 1962, the pre-need sales started to level out, which eliminated the necessity of putting up cash to fund new receivables. Also, in 1960, plaintiff began selling funeral service debentures. These debentures were sold to persons owning interment space at Kose Hills and were convertible into funeral, commodity and other services offered by plaintiff. By September 80, 1967, debentures totaling over 6.7 million dollars had been sold. On September 80, 1968, plaintiff had over 7 million dollars in cash and a net worth of 10 million dollars. At the end of 1952, plaintiff’s net worth was $329,715. This net worth increase is solely attributable to plaintiff’s earnings, all of which have been reinvested in its properties and operations.
The Bartolo LiquidatioN
50. Liquidation of Bartolo was delayed because under a particular California law, immediate liquidation would have given rise to a state tax liability for Bartolo (and for plaintiff as transferee) of about $180,000, unless Bartolo was exempt from income taxes. Prior to the liquidation, plaintiff sought federal and state tax rulings that Bartolo was exempt from income taxes, but the rulings were not granted either by the Internal Revenue Service or the California Franchise Tax Board. When the state law was altered to conform to federal tax law, in 1957, Bartolo was liquidated. Had the state law not been changed, it is doubtful that plain *57 tiff would have liquidated Bartolo. See finding 22, n. 5, supra, referring to a long-term agreement made after December 1, 1952.
51. Between the time of the stock purchase and the liquidation of Bartolo, plaintiff acquired its needed inventory from time to time by means of the reduction of Bartolo’s surplus and by distributions in partial liquidation to plaintiff, Bartolo’s only stockholder.
Rose Hills — 1968
52. Plaintiff now owns approximately 2,480 contiguous acres in Whittier, California.[7] The entire property is zoned agricultural (which permits cemetery use), and is dedicated for cemetery use. Conditional use permits for cemetery utilization have been obtained on 1,300 acres.
53. Plaintiff is a memorial park — with the exception of a few upright tombstones in the original cemetery property; the memorial tablets are placed flush on the ground which enables the cemetery to be maintained in a generally beautiful park-like appearance and makes for maintenance efficiency.
Approximately 350 gross acres of the property have been fully developed — the property in which the roadways provide access, water systems are installed, grass has been planted, trees and shrubs are in place, and it is ready for interment. Six hundred acres have been rough-graded and are not fully developed.
54. Plaintiff is the largest cemetery in terms of sales of interment spaces. Since 1914, there have been over 92,500 interments (grave, crypt and niche burials) at the cemetery. About 175,000 interment spaces are sold but still unoccupied.
55. Plaintiff still has 2,160 acres of unsold land which has been dedicated for cemetery use. Such land will provide an inventory for approximately 180 more years.
56. Plaintiff sells interment spaces largely on a pre-need basis. Since 1962, it has maintained a sales force of approximately 100 persons for such efforts. Before then, it had 125 *58 salesmen. Plaintiff is in competition with other cemeteries in the service area and others which overlap the area. These include both for-profit and non-profit cemetery corporations, with the exception of sectarian and public cemetery districts. Forest Lawn is plaintiff’s principal competitor and it has a sale force of approximately 100.
Plaintiff’s prices are determined by the competitive forces in its market. In the cemetery industry non-profit cemetery corporations such as plaintiff generally have business policies similar to those of for-profit cemetery corporations with respect to prices, management methods, and sales methods. Plaintiff’s operations conform to that general standard.
57. Since 1947, plaintiff and its predecessor, Bartolo Company, made the following sales at the prices indicated (Plaintiff’s Exhibit 134) :

Year Price per Graves Sold Grave

1947. _ 3,280 $108
1948-_ 3,756 116
1949. _ 3,157 125
1950-_ 3,771 202
1951- 11,723 139
1952- 11,570 156
1953_ 13,068 156
1954- 13,018 147
1955- 12,148 154
1956_ 14,452 170
1957- 15,171 185
1958- 11,773 200
1959_ 11,425 203
1960_ 13,051 196
1961_ 11,837 206
1962_ 11,373 203
1963_ 11,687 213
1964_ 12,231 221
1965_ 8,265 232
1966- 6,989 238
1967_ 7,634 243
The decrease in sales from 1965 was due solely to a smaller sales force.
*59 58. From December 1, 1952 through. September 30, 1968, plaintiff paid the former Bartolo shareholders $5,508,000 under the 1952 agreement. In the year in suit, taxpayer paid $120,000 under the agreement. As of September 30, 1968, an additional $1,884,784 was due under the contract to the sellers, but remained unpaid because of subordination agreements. Moreover, if the reduced percentages provided under the amendment to the agreement had not been in effect from 1958-1967, an additional $2,577,000 would have been due, but unpaid as of September 30, 1968.
Jurisdictional Facts
59. On February 19,1952, plaintiff applied to the Internal Eevenue Service for a ruling that it was exempt from federal income tax under section 101(5) of the Internal Eevenue Code of 1939. A ruling stating that plaintiff was so exempt was issued by the Service on August 27,1952.
On July 20, 1953, Bartolo applied to the Service for a ruling that it was exempt from taxation. That application was ultimately denied.
60. On August 14, 1964, the District Director of Internal Eevenue for Los Angeles recommended that plaintiff’s exemption ruling be revoked.[8] Following the filing of a protest by plaintiff and a conference with representatives of the Internal Eevenue Service, plaintiff filed on February 3,1966, a federal income tax return for its fiscal year ending September 30, 1965.[9] Plaintiff paid the tax of $237,264 shown thereon and filed a claim for refund for this amount. No portion of that amount has been refunded.
61. An audit of plaintiff’s return for that year was conducted by the Internal Eevenue Service and a deficiency in the amount of $6,031 was proposed. Plaintiff paid the deficiency on September 23, 1966, and on or about October 4,, 1966, filed an amended claim for refund including this additional amount.[10]
*60 62. On April 21, 1967, the Internal Revenue Service assessed an additional deficiency for the fiscal year ending September 30, 1965, of $201,959. The additional deficiency resulted from the Service’s determination, inter alia, that $421,786, the amount which plaintiff accrued [11] during the fiscal year ending September 30, 1965 as its obligation to the sellers under the 1952 contract, of the $568,247 claimed by plaintiff as cost of sales of cemetery property, was not allowable as part of the cost of sales.[12] On June 9,1967, plaintiff filed a second amended federal income tax return for the fiscal year ending September 30, 1965. The return reduced taxpayer’s cost of sales in accordance with the Service’s determination; in addition, plaintiff elected to report certain of its income on the installment basis. On this return, plaintiff reported taxable income, of $523,554 and a tax liability of $245,219, of which $1,924 was unpaid. It later paid that amount.
63. On September 1,1967, plaintiff paid the assessment of $201,959, and on October 4,1967, it filed a further amended claim for refund in the amount of $447,178 representing all taxes paid for said year, plus interest thereon. On October 9, 1967, the District Director of Internal Revenue for Los An-geles, disallowed the -amended claim for refund. The Government has now conceded that plaintiff would, in any event, be entitled to report certain of its income on the installment basis. Accordingly, on December 31, 1969, the Government gave plaintiff a partial administrative refund of $201,959 with interest thereon.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to exemption from the income tax under § 501(c) (13) of the Internal Revenue Code of 1954. Accordingly, judgment is entered dismissing plaintiff’s petition.

We have herein used material from the opinion of Trial Commissioner George Willi, though we reach a contrary result.

 Internal Revenue Code of 1954 (26 U.S.C.) :
“SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC."
*****
(c) List of Exempt Organizations. — The following organizations are referred to in subsection (a) :
*****
“(13) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual.’’

 Since plaintiff sells gravesites to the public on a commercially competitive basis and makes a profit thereby, It does not qualify under either of the exempt categories mentioned in the language preceding the semicolon. See. Knollwood Memorial Gardens v. Commissioner, 46 T.C. 764, 784 (1966).

 In separate transactions, plaintiff had earlier bought 61 acres and 9.6 acres from Bartolo for $2,055,306 and $563,740, respectively. Both of these purchases provided that the sale price was to be paid in ten years, and we see no reason to doubt that they were bona fide sales.

 (2) EXCEPTION. — If property Is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if — ■
"(A) the distribution is pursuant to a plan of liquidation adopted—
“ (1) on or after June 22,1954, and
"(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and
“(B) stock of the distributing corporation possessing at least SO percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of,
“(i) the date of the first acquisition by purchase of such stock, or
“(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee Is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was mgdq,”

 “If the property was acquired after December 31, 1920, by a corporation — -
* * * * *
“(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as It would be in the hands of the transferor, increased in the amount of gain or decreased In the amount of loss recognized to the transferor upon such transfer under the law applicable to the year In which the transfer was made.”

 Although John D. Gregg was not directly a Banslope stockholder, his children owned about 50 percent of the stock which was held In trust. John D. Gregg, however, was not a trustee of these trusts.

 On December IS, 1946, G. Orton transferred his 550 shares to K. L, McNitt, Jr.

 This agreement was amended on January 1, 1952, at which time the initial borrowing had been curtailed to $400,000. By the amendment the banks were committed to lend an additional $250,000, with interest at 4% percent.

 The remaining articles provided for plaintiff’s leasing Bartolo’s buildings, tools and equipment, water system, an option by Bartolo to construct additional buildings, mausoleums or malre other improvements upon the cemetery which were desired by the plaintiff. Finally, it appointed plaintiff to collect Bartolo’s accounts receivable due as of October 81, 1950 on sales prior to that date.

 Pursuant to a contract entered into on February 27, 1953, but effective September 1951, plaintiff purchased an additional 8.1 acres from Bartolo of which 1.5 acres had been transferred prior to December 1, 1952. As to terms of payment the contract was similar to those of the September 28, 1952 and July 1, 1951 agreements — the payment was due 10 years after date of deed or on February 26, 1963.

 On May 26, 1956, Bartolo, plaintiff, Security and Citizens Banks amended the credit agreement of December 1, 1954. Security committed itself to loan an additional $1,400,000 and Citizens an additional $100,000 up to May 1, 1958. The conditions for such commitments were similar to those contained in the December 1,1954 agreement.

 In the terns of acreage, plaintiff has the largest single location for a cemetery In the United States.

 On March 10, 1966, the Internal Revenue Service Issued a ruling revoking-the prior acknowledgment of plaintiff’s tax exemption effective for all fiscal years beginning after September 30,1961.

 Plaintiff claimed in the return that its cost of sales of cemetery properties* was $568,247.

 Plaintiff conceded, however, that if it, was n,o,i; exempt, this additional assessment was correct.

 The amount accrued under the contract was $422,525. This discrepancy is not explained. In any event, it is to plaintiff’s advantage that a lower figure be used.

 A total of $5,408 was allowed as an addition to the cost Of sales resulting in a net disallowance in the cost of sales of $416,380.