[Civ. No. 46824. Second Dist., Div. Three. Jan. 27, 1976.]

Estate of JOHN D. GREGG, Deceased.
TITLE INSURANCE AND TRUST COMPANY,
Petitioner and Respondent, v.
LUCELA C. LOWRY, Objector and Appellant.

**COUNSEL**

Burkley & Moore and Christopher M. Moore for Objector and Appellant.

Sheppard, Mullin, Richter & Hampton, Wesley L. Nutten III and Laurence K. Gould, Jr., for Petitioner and Respondent.

**OPINION**

**FORD, P. J.**—Appellant Lucela C. Lowry, the former Lucela Gregg, is the sole income beneficiary of a marital trust created under the will of

her deceased husband, John D. Gregg. Respondent Title Insurance and Trust Company, the trustee of the marital trust, petitioned the probate court for an order instructing it to allocate payments received under the Bartolo contract, the major asset of the marital trust, to principal of the trust rather than to income.

A hearing was had on respondent's petition. It was stipulated by the parties that certain documents be received in evidence. The probate court determined that "[a]ll payments from 'Bartolo Contract' are to be treated as principal for purposes of the administration of the Marital Trust." Findings of fact and conclusions of law were filed and an "Order, Judgment and Decree" was entered on March 20, 1975. Notice of appeal therefrom was filed by the objector to the trustee's petition, appellant herein, Lucela C. Lowry.

The trial court's findings of fact are summarized herein (the numerical order of the findings being changed herein). The trial court found that:

1. Appellant's husband, John D. Gregg (hereinafter Gregg), was "[f]rom 1930 through at least 1950 . . . entrusted with the general management of the Bartolo Company, a California corporation, which operated a cemetery known as Rose Hills Memorial Park in Whittier, California."

2. Appellant's husband (Gregg) "owned a portion of the issued and outstanding shares of stock of the Bartolo Company," which company owned "cemetery land, buildings, and improvements adjacent to Rose Hills."

3. In 1950 a nonprofit cemetery corporation known as Rose Hills Memorial Park Association (hereinafter Rose Hills) was incorporated and Gregg became president, a position he retained until his death.[1]

4. On December 26, 1952, Gregg and all other shareholders of the Bartolo Company entered into an agreement (hereinafter designated as the Bartolo contract) with Rose Hills to sell to Rose Hills all the issued and outstanding shares of Bartolo Company stock. "In consideration therefor, Rose Hills agreed to pay the Bartolo shareholders a purchase price calculated according to a formula based on the gross selling prices

---

[1] The majority of the trustees of Rose Hills were either shareholders of the Bartolo Company or members of the law firm which represented the Bartolo Company.

of grave spaces, niches, crypts, and columbariums in the Rose Hills Cemetery. . . . All parties to the contract treated it as one for the sale of capital assets."

5. "The former Bartolo shareholders collectively expected to receive total payments of $615,000 per year under the 'Bartolo Contract,' and Decedent [Gregg] was entitled to receive nearly one-half of that amount. In 1957 Decedent wrote a letter stating his expectation that by 1965 more than $7,500,000 would be due the former Bartolo shareholders under the terms of the 'Bartolo Contract.' As a shareholder and director of the Bartolo Company as well as the president of Rose Hills, Decedent was thoroughly familiar with the terms of the 'Bartolo Contract' and the sizeable amounts of the payments due him under the agreement."

6. Gregg's will was dated December 18, 1953. The major asset of Gregg's estate was his right to the proceeds under the Bartolo contract. Gregg's will "provides *inter alia* for a 'Marital Trust' for the benefit of his surviving spouse and three 'Residuary Trusts,' one for his surviving spouse and one each for his two daughters. In providing how the trustee of these trusts shall allocate receipts between principal and income, Decedent provided: [¶] 'In determining what is income, what is net income, what is principal, and what is chargeable to each, the trustee shall have absolute discretion with respect to the residuary trusts and shall be controlled by the Principal and Income Act in force at the time in California with respect to the marital trust.' [¶] In providing that the Principal and Income Act would govern the trustee's allocation of receipts to the Marital Trust, Decedent understood that his intent as to allocation of receipts between principal and income would control the trustee's allocation."

7. "Throughout his lifetime, Decedent treated his stock in the Bartolo Company as a capital asset, and he always reported gain from the sale of such stock as long term capital gain on his federal and state individual income tax returns."

8. Decedent died on September 23, 1959. Decedent's right to proceeds under the Bartolo contract was listed in the inventory and appraisement filed in his estate and was valued in the amount of $932,757.87, which amount constituted nearly three-quarters of the value of his estate, the total appraised value of which was $1,296,957.21.

9. "Decedent understood and intended the term 'principal' in his Will to include all payments received under the 'Bartolo Contract.' All receipts from the 'Bartolo Contract' are 'principal' within the meaning and intent of John D. Gregg as expressed in his Will and the Marital Trust established pursuant to the Order for Preliminary Distribution thereunder."

10. "The decision of the initial and successor Trustees of the Marital Trust to allocate to principal all proceeds received by the Marital Trust from the 'Bartolo Contract' is in accordance with the California Principal and Income Act and with the testator's intent. The allocations to principal by the Trustees of both the Residuary Trusts and the Marital Trust have been approved by the Court in accountings filed in Decedent's estate, and such allocations and accountings are correct."

Appellant contends that the payments to the estate under the Bartolo contract are income, being either corporate distributions (classified as income under Civ. Code, § 730.06, subd. (d)) or the profits of a business (classified as income under Civ. Code, § 730.08). This is so, appellant asserts, because "the transfer of shares which gave rise to the Bartolo Contract was in reality a contribution to the capital of Rose Hills Memorial Park Association." In making this assertion, appellant relies on findings of fact made by the Court of Claims in *Rose Hills Memorial Park Association* v. *United States* (1972) 463 F.2d 425 [199 Ct.Cl. 6].[2] The findings of fact of the Court of Claims in that case were introduced in evidence by stipulation of the parties in the instant case.

*Rose Hills Memorial Park Association* v. *United States, supra,* 463 F.2d 425, involved a tax refund suit filed by Rose Hills after the Internal Revenue Service revoked its tax exempt status as a charitable corporation under the provisions of section 501, subdivision (c)(13), of the Internal Revenue Code of 1954. The core of the Court of Claims decision was the determination with respect to the nature of the agreement between Rose Hills and the shareholders of the Bartolo Company made on December 26, 1952, herein designated as the Bartolo contract, by which Rose Hills acquired the greatest portion of its land. (463 F.2d at p. 427.)

---

[2] While appellant acknowledges that the Court of Claims decision is not binding on this court either under the doctrine of res judicata or the doctrine of collateral estoppel, nevertheless it is appellant's position that the Court of Claims' reasoning with respect to the nature of the transaction embodied in the Bartolo contract is equally applicable here.

In support of its claim to a tax exempt status Rose Hills relied on that portion of Internal Revenue Code section 501, subdivision (c)(13), which included the following language: ". . . any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

The Court of Claims determined that under the Bartolo contract the former shareholders of the Bartolo Company received the benefits of or a benefit from the net earnings of Rose Hills. The Court of Claims stated (463 F.2d at p. 431): "The substance of this transaction [the Bartolo contract] resembles an equity interest because all the traditional elements of a valid debt are missing. [Citations.] (1) There was no unqualified obligation on plaintiff [Rose Hills] to pay because the installments depended on the sale of gravesites. (2) There was no maturity date because the obligation was to continue until all lots were sold. . . . (3) There was no sum certain because the market price of gravesites could change. . . . (4) There was no stated interest rate. (5) There was no minimum annual payment. (6) There was no right to share with general creditors in the assets because subsequent to the agreement the former Bartolo shareholders exercised their discretion to subordinate their claim to other debts. (7) In addition, there was no paid-in capitalization to the business. It [Rose Hills] was formed specifically to be the recipient of land, most of which had been acquired by Bartolo only a year or so before. (8) And lastly, the transferors [shareholders of Bartolo Company] had complete control over plaintiff's [Rose Hills'] operations because they constituted its trustees. . . . By themselves, each of these factors might be acceptable in a valid debt instrument, but taken together, they are overwhelmingly persuasive that this transaction [the Bartolo contract] created an equity interest in plaintiff. . . ."

Since the Court of Claims decided in *Rose Hills Memorial Park Association* v. *United States, supra,* 463 F.2d 425, that the ·Bartolo contract did not represent a true sale of stock but rather the acquisition by shareholders of the Bartolo Company of an equity interest in Rose Hills Memorial Park Association, appellant contends here that the payments received by the trust under the Bartolo contract represent a return on an equity investment and not the proceeds of a sale.

"In determining what constitutes income or principal, the paramount rule is that the intention of the creator of the estates or interests, when

ascertainable, is controlling if not otherwise contrary to law." (31 Cal.Jur.2d, Life Estates, Remainders and Reversions, § 51, p. 400.) As was said by the court in *Estate of Colyear,* 17 Cal.App.3d 173, at pages 179-180 [94 Cal.Rptr. 696]: "Under California law, where a decedent directs the manner of allocation of income, dividends and profits between income and principal, such direction is controlling. 'The Principal and Income Law [fn. omitted] governs the ascertainment of income and principal then, unless the trust instrument contains a provision differing from a matter covered by this chapter, or the trustor directs the "manner of ascertainment of income and principal" or grants "discretion" to the trustee to do so.' (*Estate of Bixby,* 55 Cal.2d 819, 823 [13 Cal.Rptr. 411, 362 P.2d 43].)"[3]

The intent of the trustor must be ascertained from the terms of his will and his intent is to be determined as of the time of his death. (Prob. Code, § 101; *Estate of Russell,* 69 Cal.2d 200, 205-206 [70 Cal.Rptr. 561, 444 P.2d 353]; *Estate of Hotaling,* 74 Cal.App.2d 898, 902-903 [170 P.2d 111].) In the instant case extrinsic evidence was introduced to aid the court in its interpretation of Gregg's will. However, the extrinsic evidence was not conflicting and, accordingly, on review this court must make an independent determination of the meaning of the will. (*Estate of Russell, supra,* at p. 213; *Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

By his will Gregg provided specifically that the trustee of the marital trust be controlled by the California Principal and Income Act in making determinations respecting "what is income, what is principal, and what is chargeable to each." Thus, Gregg having in his will expressed his intention with respect to the allocation of principal and income, that intention controls. However, Gregg intended that the "Principal and Income Act in force *at the time in California*" govern. (Italics added.)

---

[3] At the time of Gregg's death the Principal and Income Act provided in section 730.04 as follows: "This chapter shall govern the ascertainment of income and principal and the apportionment of receipts and expenses between tenants and remaindermen in all cases where a principal has been established with or, unless otherwise stated hereinafter, without the interposition of a trust; except that in the establishment of the principal provision may be made touching all matters covered by this chapter, and the person establishing the principal may himself direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person to do so, and such provision and direction, where not otherwise contrary to law, shall control notwithstanding this chapter. The exercise by the trustee or other designated person, of such discretionary power if in good faith and according to his best judgment, shall be conclusive, irrespective of whether it may be in accordance with the determination which the court having jurisdiction would have made."

In order to resolve the question presented in this case with respect to the proper allocation of payments received by the marital trust under the Bartolo contract, it is necessary to analyze the nature of the estate left in trust by Gregg.

After leaving his interest in their residence or residences, his automobiles and all of his "articles of personal, domestic or household use or ornament" to his wife, Gregg left the "residue" in trust and directed the trustee to divide the residue into two parts. Gregg provided that the first part be designated as the marital trust. The second part of the residue of Gregg's estate, after deduction therefrom of inheritance and succession taxes, was to be designated the residuary trust and divided into three separate trusts, one each for the benefit of appellant and Gregg's two daughters.

Gregg's interest in the Bartolo contract was inventoried as an asset of his estate and valued at $932,757.87, and thus it represented approximately three-fourths of the total inventory value of his estate. Under an order for preliminary distribution the probate court allocated one-half of "[d]ecedent's right, title and interests" under the Bartolo contract to the marital trust and one-half to the residuary trust. In the administration of the marital trust from 1960 to the time of the judicial determination now under review all payments under the Bartolo contract were allocated to the principal of the various trusts.

California has adopted the Revised Uniform Principal and Income Act,[4] which defines principal as follows (Civ. Code, § 730.03, subd. (b)): "Principal is the property which has been set aside by the owner or the person legally empowered so that it is held in trust eventually to be delivered to a remainderman while the return or use of the principal is in the meantime taken or received by or held for accumulation for an income beneficiary." In the instant case Gregg set aside the residue of his estate to be held in trust and the major asset of the residue was Gregg's rights under the Bartolo contract.

The basic definition of income under the Revised Uniform Principal and Income Act is found in Civil Code section 730.03, subdivision (a):

---

[4] As noted hereinabove, the will was dated December 18, 1953, and Gregg died September 23, 1959. The Principal and Income Law (Civ. Code, § 730 et seq.) was added in 1953 (Stats. 1953, ch. 37, § 1, p. 666). It was superseded by the Revised Uniform Principal and Income Act (Civ. Code, § 730 et seq.) added in 1967 (Stats. 1967, ch. 1508, § 2, p. 3576, operative July 1, 1968).

"Income is the return in money or property derived from the use of principal . . . ." It must be determined whether the payments received by the trust under the Bartolo contract represent property set aside by Gregg to be held in trust and eventually delivered to the remaindermen or whether they represent a return derived from the use of principal.

Civil Code section 730.06,[5] upon which appellant relies, sets forth the law with respect to the allocation of corporate distributions between principal and income. However, Civil Code section 730.06 relates to corporate distributions received by a trust which owns stock in the corporation. (See Rest.2d Trusts, § 236, p. 571.) In the instant case the marital trust owns no shares of stock in Rose Hills.

Appellant also claims that payments received by the trust pursuant to the Bartolo contract represent income as profit from a business under Civil Code section 730.08.[6] The facts do not indicate that respondent

---

[5] Civil Code section 730.06 is as follows:

"(a) Corporate distributions of shares of the distributing corporation, including distributions in the form of a stock split or stock dividend, are principal. A right to subscribe to shares or other securities issued by the distributing corporation accruing to stockholders on account of their stock ownership and the proceeds of any sale of the right are principal.

"(b) Except to the extent that the corporation indicates that some part of a corporate distribution is a settlement of preferred or guaranteed dividends accrued since the trustee became a stockholder or is in lieu of an ordinary cash dividend, a corporate distribution is principal if the distribution is pursuant to

"(1) A call of shares;

"(2) A merger, consolidation, reorganization, or other plan by which assets of the corporation are acquired by another corporation; or

"(3) A total or partial liquidation of the corporation, including any distribution which the corporation indicates is a distribution in total or partial liquidation or any distribution of assets, other than cash, pursuant to a court decree or final administrative order by a government agency ordering distribution of the particular assets.

"(c) Distributions made from ordinary income by a regulated investment company or by a trust qualifying and electing to be taxed under federal law as a real estate investment trust are income. All other distributions made by the company or trust, including distributions from capital gains, depreciation, or depletion, whether in the form of cash or an option to take new stock or cash or an option to purchase additional shares, are principal.

"(d) Except as provided in subdivisions (a), (b), and (c), all corporate distributions are income, including cash dividends, distributions of or rights to subscribe to shares or securities or obligations of corporations other than the distributing corporation, and the proceeds of the rights or property distributions. Except as provided in subdivisions (b) and (c), if the distributing corporation gives a stockholder an option to receive a distribution either in cash or in its own shares, the distribution chosen is income.

· "(e) The trustee may rely upon any statement of the distributing corporation as to any fact relevant under any provision of this chapter concerning the source or character of dividends or distributions of corporate assets."

[6] Civil Code section 730.08 provides as follows:

"(a) If a trustee uses any part of the principal in the continuance of a business of

used any part of the principal of the marital trust in the continuance of a business of which Gregg, the settlor, was a sole proprietor or a partner. Civil Code section 730.08 is inapplicable.

Civil Code section 730.02 provides in pertinent part as follows:

"(a) A trust shall be administered with due regard to the respective interests of income beneficiaries and remaindermen. A trust is so administered with respect to the allocation of receipts and expenditures if a receipt is credited or an expenditure is charged to income or principal or partly to each—
"(1) In accordance with the terms of the trust instrument, notwithstanding contrary provisions of this chapter;
"(2) In the absence of any contrary terms of the trust instrument, in accordance with the provisions of this chapter; or
"(3) If neither of the preceding rules of administration is applicable, in accordance with what is reasonable and equitable in view of the interests of those entitled to income as well as of those entitled to principal, and in view of the manner in which men of ordinary prudence, discretion and judgment would act in the management of their own affairs."

In the instant case the decedent's will directs the trustee to the provisions of the Principal and Income Act for guidance in making determinations as to what is income and what is principal. However, the provisions of the Revised Uniform Principal and Income Act do not expressly cover the situation presented in this case. Accordingly, the trustee is governed by Civil Code section 730.02, subdivision (a)(3), in making the determination called for herein.

The emphasis in the legislative directive given to the trustee in Civil Code section 730.02 is on "due regard to the respective interests of income beneficiaries and remaindermen." It was stated in *In re Weiss*

---

which the settlor was a sole proprietor or a partner, the net profits of the business, computed in accordance with generally accepted accounting principles for a comparable business and subject to the provisions of subdivision (c), are income. If a loss results in any fiscal or calendar year, the loss falls on principal and shall not be carried into any other fiscal or calendar year for purposes of calculating net income.
"(b) Generally accepted accounting principles shall be used to determine income from an agricultural or farming operation, including the raising of animals or the operation of a nursery, subject to the provisions of subdivision (c).
"(c) Subdivisions (a) and (b) are subject to the provisions of Section 730.14 and for this purpose any property of such business or agricultural or farming operation shall be deemed to be 'property held in such trust' within the meaning of Section 730.14."

*Estate,* 454 Pa. 114 [309 A.2d 793, 800]: "The short of the matter is that while not bound by the act [the Uniform Principal and Income Act], the trustees must still be governed by the overriding concept of fairness and impartiality, and must administer the trust with due regard to the respective interests of income beneficiaries and remaindermen. [Fn. omitted.]"

The court further stated in *In re Weiss Estate* (309 A.2d at pp. 799-800): "Whether or not the testator has empowered his trustees . . . to favor the named income beneficiaries over the . . . remainderman, or vice versa, is a question of intent. [Citations.] That intent must be derived from an examination of the entire will, viewed in the light of the circumstances of the testator. [Citations.]"

In the case presently before us, the trial court found that "[a]s a shareholder and director of the Bartolo Company" Gregg was "thoroughly familiar with the terms of the 'Bartolo Contract' and the sizeable amounts of the payments due him under the agreement." When Gregg executed his will he was receiving approximately $300,000 per year under the Bartolo contract. Nevertheless, Gregg provided in his will that if the combined income from the marital trust and the residuary trust created for the benefit of his wife did not amount to at least $20,000 each calendar year, then the principal of the marital trust could be invaded to make up the difference. This provision indicates that Gregg did not anticipate or intend that payments under the Bartolo contract then amounting to $300,000 per year would be allocated to income of the trust.

Gregg gave the trustee of the marital trust power in his discretion to apply or distribute any part or all of the principal of the marital trust to appellant "for her welfare, comfort and support or for the relief of any want or distress affecting or concerning her." Furthermore, Gregg provided that appellant have a power of appointment with respect to the principal of the marital trust. These provisions indicate that, if necessary, Gregg was willing to give his wife the entire principal and income of the marital trust. However, looking to the property constituting Gregg's estate and taking into consideration that the investment of the proceeds of the Bartolo contract would produce substantial income, it would appear that Gregg envisioned a comfortable income for his wife without resort to the entire principal.

The will provided that if there was no exercise of the power of appointment by appellant the principal of the marital trust would become a part of the residuary trust. By the residuary trust Gregg provided for his children and his grandchildren. If the proceeds of the Bartolo contract were allocated to income in the marital trust such a disposition could profoundly affect the size of the remainder estate.

In *Estate of Bixby*, 55 Cal.2d 819 [13 Cal.Rptr. 411, 362 P.2d 43], the decedent's will provided for four residuary trusts, one for the benefit of each of the decedent's four children. It was provided that upon the death of the life beneficiary of any of the trusts the corpus of his trust would go to augment the trust funds of the remaining trusts wherein there was a surviving life beneficiary. Upon the death of the testator's last child the corpus of the trust was to be distributed to the testator's then living grandchildren.

In *Bixby* the principal assets of the trusts were oil royalty interests and stock in Bixby Ranch Co. The trustee of the trusts treated the oil royalty interests as a wasting asset, allocating 27½ percent of the receipts to principal. The Principal and Income Law (then Civ. Code, § 730.12) provided that receipts from property subject to depletion (which included oil royalties) were to be treated as income and paid to life beneficiaries. However, the will gave the trustee power to determine what was principal and what was income. One of the questions presented in *Bixby* was whether the trustee in making the challenged allocations (part to principal and part to income) exercised his discretion "in good faith" and "according to his best judgment." (See former Civ. Code, § 730.04.) The Supreme Court stated (55 Cal.2d at p. 824): "The testator's intent is to be construed from the instrument as a whole. [Citation.] . . . [¶] We are persuaded by a reading of the above provisions and the testator's will in its entirety that . . . [testator] plainly intended that the lawful issue of the body of each of his four children, his grandchildren, were to share per capita in his estate. Otherwise he would not have made his four children life beneficiaries but, on the contrary, it is reasonable to assume that he would have given the entire estate to his children outright without the intervention of a trust. The whole purpose of the four trusts was to preserve a substantial or major part of his trust estate for his lineal descendants beyond his four children. It is apparent, therefore, that the trustee's allocation to principal was in accordance with a reasonable construction of the testator's intent, and not contrary to it, and was not an abuse of its discretion for this reason."

In *Comstock* v. *Corwin,* 111 Cal.App.2d 770 [245 P.2d 654], the language creating a testamentary trust was in part as follows (111 Cal.App.2d at p. 771): " 'Said real property to be sold when there is a market and the *proceeds* invested in or loaned on good securities. The interest and *proceeds* to go to Gailen Stafford Comstock during his lifetime, and after his death to the heirs of his body in equal shares. . . .' " The real property was distributed to the trustee in 1935 and in 1947 the trustee sold the property and the proceeds of the sale were invested in certain corporate securities. Gailen Comstock claimed that the corpus of the trust should be delivered to him as "proceeds." However, the appellate court pointed out that such an interpretation ". . . would render the concluding sentence of the trust provision surplusage and of no effect, for if 'proceeds' be deemed to mean the corpus of the trust, and if such corpus be immediately paid over to plaintiff, vesting legal and equitable title in him, there could be nothing but a memory to vest in the remaindermen referred to in the elder Comstock's will. Such construction would be tantamount to creating a new and different testamentary disposition from that manifested by the decedent." (111 Cal.App.2d at pp. 772-773.)

■ The reasoning of the above cases is applicable here. If the payments under the Bartolo contract, which it will be remembered amounted to approximately $300,000 a year at the time of Gregg's death, were allocated to income rather than to principal, the eventual estate of the remaindermen, in this case Gregg's children and grandchildren, would be severely curtailed. Gregg's interest under the Bartolo contract was significant in the present context in that it was the main source from which a trust principal could be established so as to fully carry out the expressed purposes of the marital trust.

We conclude that the trial court properly found that Gregg intended the payments under the Bartolo contract to constitute principal of the marital trust and that nothing in the former Principal and Income Law or in the current Revised Uniform Principal and Income Act compels a contrary conclusion.

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied February 18, 1976, and appellant's petition for a hearing by the Supreme Court was denied March 24, 1976.